COURT OF APPEALS OF VIRGINIA

Present:  Judges Benton, Haley and Senior Judge Annunziata
Argued at Alexandria, Virginia


JAIME SALVADOR MOLINA, S/K/A
  JAMIE SALVADOR MOLINA
                                                    OPINION BY
v.       Record No. 0630-04-4          JUDGE ROSEMARIE ANNUNZIATA
                                                    JANUARY 10, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan C. Thacher, Judge

        S. Jane Chittom, Appellate Defender (Virginia Indigent Defense
        Commission, on brief), for appellant.

        Eugene Murphy, Senior Assistant Attorney General (Jerry W.
        Kilgore, Attorney General, on brief), for appellee.


        Jaime Salvador Molina appeals his convictions of rape and forcible sodomy on the

grounds that:  (1) the trial court erred in granting Instruction 14; (2) the trial court erred in

limiting the testimony of an expert; and (3) the evidence was insufficient to support the jury's

verdicts.  For the reasons that follow, we affirm.

                                        BACKGROUND

        On appeal, we review the evidence in the light most favorable to the Commonwealth, the

party prevailing below, together with all reasonable inferences that may be drawn.  Garcia v.

Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003).  So viewed, the evidence

established that, around 10:00 a.m. on September 28, 2002, Stephanie Moroffko left her

residence and walked to a convenience store where she bought milk and wine.  She then sat on a

brick wall nearby and started drinking the wine.  Molina, whom Moroffko did not know,

approached and spoke to her.  She and Molina engaged in conversation about Moroffko's family

problems, and Moroffko remembered engaging in some hugging and kissing with Molina before she was struck on the head with something hard and lost consciousness. Moroffko awoke in the hospital, suffering facial lacerations, broken facial bones, and a head injury.

Officer Michael Koltz was patrolling the area around the convenience store on September 28, 2002. As he drove his police car to the rear of a laundromat located in the area, he saw Molina standing behind a bush looking toward the ground. Molina was fully dressed and appeared to be talking to someone. Koltz noted another individual lying on the ground; the individual was later identified as Jose Membrano. Within twenty seconds of Koltz's arrival, Molina "leaned over at the waist and looked in [the police officer's] direction." He then "stood up and began to walk away from the bush, across the parking lot in a northeasterly direction." Koltz approached Molina and engaged him in conversation, at which time he saw Membrano exit from behind the bush. Subsequently, he found Moroffko lying on the ground behind the bush where Molina and Membrano had been when Koltz arrived. Moroffko was unconscious and partially nude. Koltz's efforts to revive her were unsuccessful. Based on Molina's conduct, flushed face, reddened eyes, and an odor of alcohol that he emitted, Koltz arrested Molina for being drunk in public.

Emergency Medical Services (EMS) worker Lieutenant Linda Arnold responded to Koltz's call for assistance. Arnold testified that she found Moroffko unconscious and unresponsive, lying face up on the ground in the midst of debris, behind a tree. She was unclothed from the waist down, and swelling on her face and eyes was observable.

Nancy Susco, a registered nurse in the emergency room at INOVA Fairfax Hospital where EMS personnel transported Moroffko, collected evidence from her using a physical evidence recovery kit (PERK). Susco described Moroffko as disheveled, her hair matted, and

covered in blood and debris. Using a special dye and a medscope, Susco found that Moroffko had some "scattered uptake" injuries to her vaginal area.[1]

Detective John Kelly, the lead detective in the investigation, interviewed Molina on September 29, 2002. Molina admitted having consensual sexual intercourse with Moroffko, but denied having anal intercourse. In his statement to Kelly, Molina described what occurred during his encounter with Moroffko. According to Molina, after Moroffko told him about her family problems, she said she wanted to lie down and have sexual intercourse. Molina further recounted that Moroffko "pulled him down on top of her" after he helped her lie down, "and they had sex." Afterwards, Molina left the area to speak with some friends. When he realized that Membrano was not among the group, he returned to the area behind the bush and saw Membrano on top of Moroffko. Molina said he told Membrano to leave Moroffko alone. Membrano refused and turned Moroffko over, instead. According to Molina, Moroffko was less clothed than she had been when he had sex with her and, in contrast with her earlier appearance, she looked sick and drunk.

Jennifer Gombos, a forensic scientist for the Department of Forensic Science, was qualified as an expert in DNA analysis. Molina stipulated to the admission of the certificate of analysis, which showed that his DNA was found in vaginal and anal swabs taken from Moroffko. Molina could not be eliminated as a possible contributor of the material on either swab; the test eliminated Membrano. On cross-examination, Gombos testified that it is "possible in certain circumstances" that seminal fluid can be transferred to another part of the body, with the caveat that "it's highly unlikely that it gets transferred from an external portion of the body to an

---

[1] Susco explained that she applies a dye called "teludine blue" to determine if there is an injury. According to Susco, "[t]hat dye adheres to any skin that's been torn away."

internal area of the body naturally, without being manually done or some physical force being used in order to take something from the external part of the body and insert it vaginally."

At trial, Moroffko testified that she took prescribed doses of Xanax, Zanaflex, Lithium, Zoloft, Zethacoat, and Nexium the night before the incident. However, she denied taking cocaine or any other illicit drugs and could not explain the presence of cocaine in her system. Addressing her drug intake on September 28th, Moroffko stated:

> I hadn't taken anything. I don't know if I had taken my medication or not, but if I had it was what was prescribed. And I drank just the wine that I said I drank and had a seizure, so it was not just because of my pills or the alcohol.

Moroffko could not recall the interview she had with the police at the hospital on the day of the incident, despite being shown a transcript of the interview. She was able to recall a second interview conducted by the police at the hospital the next day. When confronted with inconsistencies or certain responses elicited in the second interview, Moroffko either could not recall having made the statements or denied the accuracy of the information. Moroffko conceded she experienced past episodes of losing consciousness and "black outs" in which she suffered a loss of memory. She further acknowledged a history of abusing alcohol and prescribed drugs, as well as a history of seizures and bipolar disease. She attributed the blackout episodes she experienced to an excessive use of prescribed medication or alcohol or both. She denied the occurrence of either circumstance in this case, and she consistently denied ingesting illegal dugs or giving consent to any sexual activity.

After the Commonwealth rested its case-in-chief, Molina moved to strike the evidence. The trial court granted the motions as to abduction and malicious wounding charges.

In his defense, Molina introduced testimony from five experts: Dr. Kamal Jajoda, a psychiatrist; Patrick Slifka, a licensed clinical social worker; Dr. Cynthia Gauss, a psychiatrist;

- 4 -

Dr. Magnus Ikhinmwin, an emergency room physician; and Dr. William Morton, Jr., a psychopharmacologist.

Dr. Jajoda was Moroffko's treating physician. She began treating her in July or August 2002, one to two months before the incident. Based on the history that Morrofko reported which included "mood changes, depression - - occasionally with hypomania," Dr. Jajoda thought she "probably had a bipolar disorder and that she was in what we call a mixed state," meaning she manifested "symptoms of both moods." Moroffko did not report symptoms consistent with mania when she began treatment with Dr. Jajoda, and symptoms of mania were not observed during the period she treated her, ending in September 2002. She noted, however, that Moroffko appeared to suffer from manic "episodes," namely, irritability, sleeplessness, and anxiety. Dr. Jajoda indicated in her progress notes that Moroffko was "cycling," which meant her "mood is not stabilized." Moroffko was "still going between depression and up moods, which are mild hypomania," according to this physician. She further testified that a bipolar patient who fails to take the lithium as prescribed could "go into depression or into hypomania, depending on individual response." Dr. Jajoda described hypomania as "a state when there is decreased need for sleep and increased energy and physical energy and impulsive behavior." She prescribed 900 mg of lithium per day, as well as Depakote and Tegretol, all of which "are used as mood stabilizers," in order to control Moroffko's symptoms.

Patrick Slifka, a consultant and certified substance abuse counselor for Northern Virginia Counseling Group, testified that he first met with Moroffko in March 2003 following Dr. Jajoda's referral to him. Moroffko told Slifka she drank alcohol on a daily basis. Slifka recommended she be detoxified and undergo long-term residential treatment.

Cynthia Gauss, an in-patient psychiatric physician at Fairfax Hospital, first encountered Moroffko on July 13th or 14th, 2002, when she was admitted to the psychiatric unit from the

medical unit. Moroffko entered the medical unit on July 10, 2002, after swallowing a large amount of prescription drugs, which she had received on July 9, 2002. Gauss was treating Moroffko for a depressive disorder, although she had related a history of bipolar disease. Moroffko left the psychiatric unit on July 15, 2002, against medical advice. Gauss believed Moroffko needed more extensive hospitalization in order to stabilize her moods and assure her safety.

Dr. Magnus Ikhinmwin is a physician at INOVA Fairfax Hospital who treated Moroffko in the emergency room for the multiple drug overdose on July 10, 2002, described earlier. "In addition to the diagnosis of multi drug overdose," Dr. Ikhinmwin made "a secondary diagnosis of bipolar disorder." Moroffko also tested positive for opiates at that time. Dr. Ikhinmwin subsequently cared for Moroffko when she was brought to the hospital on September 28, 2002. On that date, Moroffko could not relate any information about her medical condition. Moroffko's lab tests revealed the presence of benzodiazepine, an opiate, cocaine, a blood alcohol level "more than two times normal," and a very low lithium level. Dr. Ikhinmwin noted that the laboratory results showed the drug levels at the time the blood sample was taken in the hospital, however, he could draw no conclusions from the reports regarding Moroffko's drug levels at the time of the incident.

Dr. William Alexander Morton, Jr., Molina's fifth expert witness, is a psychopharmacologist, having earned a PhD in pharmacy and completed a residency in clinical pharmacy. He is not a medical doctor, however. Defense counsel asked Dr. Morton how an individual would behave or appear after consuming a bottle of wine and having present in their system an "indefinite quantity of cocaine, the presence of opiates, the presence of benzodiazepines, as well as a lithium level of 0.2." Morton explained that the alcohol "would be additive to the drugs that were already in the system and it follows an unpredictable type of

synergistic effect where one and one makes three or one and one makes four." Dr. Morton noted that Moroffko's blood alcohol content (BAC) of 292 milligrams per deciliters was "significantly high." He stated Moroffko's BAC could have been as high as 300 or 350 one to three hours earlier. Dr. Morton also explained that people who consume alcohol on a regular basis can acquire a "behavioral tolerance where [one] learn[s] to walk and stand up longer than [he or she] would have initially" and "may not look as intoxicated." According to Dr. Morton, such individuals can require greater quantities to achieve the same effect.

Describing "[w]hat effect . . . these factors have on memory," Dr. Morton responded:

> [A]lcohol has a significant [e]ffect on memory and it correlates with levels, higher levels. You can have memory effects in the hundreds, but certainly they're of typically [sic] blackout in the 200s and 300-milligram percent level.
> So one would not be able to recall events as they may have happened. If you add those with other substances, benzodiazepines such as Xanax, they're all in the same class. There is that additive phenomena where you actually - - that combination can be quite deadly, so we try not to have that combination present because it can cause excessive response, like I was saying earlier, synergistic effect where one equals four.
> Valium, Ativan and Xanax in themselves cause problems with memory, cause a similar blackout problem, and then the other sedative, hypnotic drug you mentioned, the opiate, that causes some sedation. So that would have some effects with memory.
> Cocaine would not necessarily diminish memory, but the alcohol and the benzodiazepine and opiate would have a dramatic effect on it.

Dr. Morton further explained that, because alcohol can significantly affect psychiatric disorders, "we would always caution against the mixing of the benzodiazepines, such as Ativan, Xanax, Valium, those type drugs, with alcohol. It should not be used," because "it can be deadly, it can cause problems with control, impulse problems with driving." Morton concluded his testimony by observing that a 0.2 level of lithium is low.

The jury found Molina guilty of rape and forcible sodomy. This appeal followed.

- 7 -

ISSUE I:  JURY INSTRUCTION 14

Background

At trial, the Commonwealth proffered Jury Instruction 14.[2]  The instruction reads as follows:

> The court instructs the jury that the defendant is charged with the crime of rape.  The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1)  That the defendant had sexual intercourse with Stephanie Moroffko who was not then the defendant's spouse; and
>
> (2)  That it was against her will and without consent; and
>
> (3)  That it was by force, threat or intimidation; or by the use of her mental incapacity or physical helplessness.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty but you shall not fix punishment until your verdict has been returned and further evidence has been heard by you.
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt either of the above offenses, then you shall find the defendant not guilty.

In addition, the trial court granted Instruction V, which defined "mentally incapacitated" as a "condition which prevented [the victim] from understanding the nature or consequences of the sexual act involved," and Instruction W, which defined "physical helplessness" as

---

[2] The Commonwealth initially proffered Jury Instruction 7, the standard instruction on rape.  Instruction 7 tracked Virginia Model Jury Instruction G44.100, which requires the Commonwealth to prove that the defendant had sexual intercourse with the victim; and "[t]hat it was against her will and without her consent; and [t]hat it was by force, threat or intimidation."  2 Virginia Model Jury Instructions, Criminal G44.100 (2004 repl. ed.).  However, after advising the trial judge that, for the rape indictment, she had "added on clause 3 that it was by force, threat or intimidation or by the use of her mental incapacity or physical helplessness," the Commonwealth's Attorney withdrew Instruction 7 and proffered Instruction 14.

- 8 -

"unconsciousness or any other condition existing at the time of the offense which otherwise rendered the complaining witness physically unable to communicate an unwillingness to act."

Relying on <u>Adkins v. Commonwealth</u>, 20 Va. App. 332, 457 S.E.2d 382 (1995), Molina argued that "mental incapacity simply would not apply at this time." He contended that the legislative purpose underlying the offense based on mental incapacity "is to protect persons who are mentally impaired or retarded from being sexual[ly] exploited due to their mental incapacity." The following colloquy took place:

> MR. KENSKY [Appellant's Attorney]: The <u>A[d]kins</u> case dealt with mental retardation and said that when we're looking at evidence of whether the victim in the case is able to appreciate the consequences of the sexual act and they said although she has mental retardation, she understands pregnancy, she had some sex ed in school, she used the words penis and vagina properly to describe intercourse.
>
> So it deals with her capacity to appreciate the sex act as it applies to her mental retardation. So under <u>A[d]kins v. Commonwealth</u>, mental incapacitation isn't just anything that may have - - from her memory of consenting. It's limited.
>
> THE COURT: It's not limited. Supposing a victim were so intoxicated as to not be able to say yes or no and totally incapacitated due to voluntary intoxication and a criminal defendant took advantage of it and raped that individual, wouldn't that come under this? Wouldn't that be mental incapacity?
>
> It doesn't say mental incapacity of a particular nature, does it? You intend to argue that this individual has some mental difficulties, do you not?
>
> MR. KENSKY: Yes. We'll be arguing that, Judge, but certainly under the way you presented it, if someone is so inebriated that they're not able to consent, you could say the exact same thing. Physical helplessness also means that and you're rendering physical helplessness to be a synonym to mental incapacitation. They mean two different things.
>
> THE COURT: The criteria, is there some scintilla of evidence which would indicate mental incapacity and there is in this case and you intend to argue it. I grant 14. I'll note your exception.

During deliberations, the jury submitted written questions to the trial judge. In Question 4, the jury asked whether "the defendant and the victim could be in the same mentally incapacitated state at the time of the incident." In response, the trial court read the voluntary intoxication instruction to the jury, apparently construing the question as one prompted by evidence in the case that Molina appeared intoxicated at the scene and that he was arrested on a drunk in public charge. In that instruction, the jury was told that "voluntary intoxication is not a defense to either the crime of rape or sodomy."

In Question 8, the jury noted that Instruction U defined consent, but that no instruction defined "against her will." The trial court instructed the jury to "give the words in the instructions their plain meaning." In Question 9, the jury asked for clarification of Instruction R, which defined the elements of sodomy. Specifically, the jury asked if the element "against her will" meant "that the victim was or could be in a mental state that could prevent her from rendering a rational decision as to her will." It also asked if the act of exercising one's will involves or implies "a process of decision making."

The trial judge instructed the jury, "You have in your possession all instructions of the court. You should use all of these instructions as they apply to the evidence in this case."

On October 24, 2003, Molina's attorney moved for a mistrial, contending that the questions the jury propounded evidenced jury confusion. Specifically, defense counsel argued:

> [B]ecause their question necessarily assumes that you can be mentally incapacitated through intoxication. That's simply not what the law allows.
> So my fear is the jury's going to decide this case applying mental incapacity. I know they have the definition of mental incapacity but I think that just underscores my earlier argument that mental incapacity is not appropriate to instruct the jury in Instruction 14, the Commonwealth's - - in arguing in the alternative, force, threat or intimidation or by mental incapacity or by physical helplessness.
> Now we have clear evidence from the jury that they're confusing it.

The trial judge found the motion untimely and refused to "revisit those issues which I have already addressed during the process of deliberations."

## A.  GRANTING INSTRUCTION 14 AS WRITTEN DID NOT CONSTITUTE REVERSIBLE ERROR

### Discussion

Molina contends the trial court erred in granting Jury Instruction 14 because it combines two alternative bases upon which the Commonwealth sought to convict Molina on the rape charge.[3]  In rejecting Molina's claim of reversible error on this ground, we begin with a review of the statute defining the crime.

In pertinent part, Code § 18.2-61(A) defines the following alternative elements of proof upon which the conviction for rape can rest:

> If any person has sexual intercourse with a complaining witness who is not his or her spouse or causes a complaining witness, whether or not his or her spouse, to engage in sexual intercourse with any other person and such act is accomplished (i) against the complaining witness's will by force, threat or intimidation of or against the complaining witness or another person, or (ii) through the use of the complaining witness's mental incapacity or physical helplessness, . . . .

Two separate Virginia Model Jury Instructions define the alternative elements of proof set forth in Code § 18.2-61(A)(i) and 18.2-61(A)(ii).  Virginia Model Jury Instruction G44.100 tracks the language in Code § 18.2-61(A)(i) and requires the Commonwealth to prove that the defendant had sexual intercourse with the victim, "[t]hat it was against her will and without her

---

[3] We note that Molina did not initially object to Jury Instruction 14 on the ground that it erroneously combined several concepts and misled the jury.  Instead, he contended the theory of mental incapacity was not an issue and should not have been presented to the jury.  During deliberations on October 24, 2003, two days after the instruction was granted, Molina first complained that the instruction was not a model instruction, erroneously combined the theories, and was misleading.  At that time, he moved for a mistrial.

The trial court asked the prosecutor if its instruction "was also a model," and the prosecutor replied, "I think – yes," to which the trial court responded, "Yes, it was the model." We note, however, that Jury Instruction 14 is not a model instruction.

consent" and "[t]hat it was by force, threat or intimidation." 2 <u>Virginia Model Jury Instructions</u>, Criminal G44.100.

Virginia Model Jury Instruction G44.300 defines the elements required to prove rape under Code § 18.2-61(A)(ii). It requires the Commonwealth to prove that the defendant had sexual intercourse with the complaining witness and further prove:

> (2) That at the time [the complaining witness] was (mentally incapacitated; physically helpless); and
> (3) That at the time of the offense the defendant knew or should have known [the complainant] was (mentally incapacitated; physically helpless); and
> (4) That the sexual intercourse was accomplished through the use of the complaining witness's (mental incapacity; physical helplessness).

2 <u>Virginia Model Jury Instructions</u>, Criminal G44.300. To establish rape under Code § 18.2-61(A)(ii), the Commonwealth need not prove force, threat or intimidation.

Molina contends that the instruction erroneously combines the two alternative theories of conviction and that it confused and misled the jury about the elements to be proved. Molina specifically asserts that Instruction 14, with its "blending" of two theories of conviction "lightens the Commonwealth's burden because it allowed the Commonwealth to prove that the act was non-consensual ('against her will') without proving force, threat or intimidation . . . ." He further argues that the instruction permitted the jury to "infer, wrongly, that one who has a 'mental incapacity' may not be able to manifest consent, that the accused is not entitled to rely on her manifestation of consent," or that the instruction permitted the jury to convict him "without proving that the complaining witness did not understand the nature and consequences of the sexual act." Finally, he contends that the instruction based on the victim's mental impairment was not supported by the evidence. We disagree with these contentions.

<u>Analysis</u>

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" <u>Darnell v. Commonwealth</u>, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting <u>Swisher v. Swisher</u>, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)). Code § 18.2-61(A) lists alternative theories by which the Commonwealth may prove rape. Each theory rests on different elements of required proof. We assume without deciding that combining the elements set forth in Code § 18.2-61(A)(i) and 18.2-61(A)(ii) into one instruction constitutes trial court error and turn to the question whether such error was harmless.

> The standard for non-constitutional error is established in Virginia's harmless error statute, Code § 8.01-678, which provides, in pertinent part:
>
> "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any error committed on the trial."

<u>Gonzales v. Commonwealth</u>, 45 Va. App. 375, 384, 611 S.E.2d 616, 620 (2005) (*en banc*).

In <u>Clay v. Commonwealth</u>, 262 Va. 253, 546 S.E.2d 728 (2001), our Supreme Court adopted the following standard applied in <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946), to non-constitutional error:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."

<u>Clay</u>, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting <u>Kotteakos</u>, 328 U.S. at 764-65).

- 13 -

Applying the standard of review articulated in Clay, we find the error to be harmless. Although the instruction combined two theories of conviction, the theories are stated in the disjunctive. Under that disjunctive formulation, the instruction directs the jury to consider either the "force" theory set forth in Code § 18.2-61(A)(i) or the "incapacity" theory set forth in Code § 18.2-61(A)(ii) as a basis for conviction, but not both at once. Although certain elements were common to both theories, (*viz.*, that Molina had sexual intercourse with the victim who was not then his spouse and that the sexual intercourse was against her will and without consent), in order to proceed to conviction under one or the other theory of conviction, the jury had to make distinctive evidentiary findings and apply distinctive legal principles as instructed. Stated differently, depending on the facts the jury found proved by the Commonwealth's evidence, the instruction directed the jury to *either* apply the law regarding "force, threat or intimidation," *or* the law regarding the "use of mental incapacity or physical helplessness." Thus, Molina's argument that the instruction allowed the jury to convict him of rape pursuant to Code § 18.2-61(A)(i) without proving "force, threat or intimidation" is belied by the language of the instruction itself which the jury is presumed to follow. Green v. Young, 264 Va. 604, 611, 571 S.E.2d 135, 139 (2002) (citing Zafiro v. United States, 506 U.S. 534, 540 (1993)).

Molina's contention that the instruction was improper and erroneously misled the jury with respect to the elements of the crime under Code § 18.2-61(A)(ii) is likewise without merit. Molina contends that the instruction improperly required the jury to find that the sexual intercourse in which he engaged with Moroffko was against her will and without consent in addition to finding that she was mentally or physically incapacitated. To be sure, the model instruction based on this theory of conviction does not require an express finding that the sexual intercourse was against the will and without the consent of the victim. However, we conclude that Molina was not prejudiced by the inclusion of this additional element of proof. First, we

- 14 -

note that the crime of rape is, at core, an offense against the will and consent of the victim, irrespective of the manner and means by which the rape is accomplished. See Mings v. Commonwealth, 85 Va. 638, 640, 8 S.E. 474, 475 (1889) (the essence of the crime of rape "consists in the ravishment of a [victim] without her consent;" therefore, the issue is whether the victim was willing or not); Bailey v. Commonwealth, 82 Va. 107, 111 (1886) (whenever there is a carnal connection without consent, the wrongful act itself supplies the requisite force that the law demands as an element of the crime).

Second, we note that the inability to freely exercise will and give consent is not solely a function of force, threat or intimidation by the perpetrator. When the offense involves a victim who is mentally incapacitated or physically helpless, the inability to consent or willingly engage in the sexual act is inherent in the very condition from which the victim suffers, as the definitions make manifest. Mental incapacity is a "condition" that "prevents the [victim] from understanding the nature or consequences of the sexual act involved." Code § 18.2-67.10(3). Consent without understanding is no consent at all. Similarly, physical helplessness rests on definitional elements, which in themselves signify the absence of consent or an unwillingness to engage in the sexual act. Code § 18.2-67.10(4). Physical helplessness is defined as "unconsciousness or any other condition" which physically prevents the victim from communicating unwillingness to act. Id. If the victim is unconscious or physically unable to communicate an unwillingness to act, consent surely cannot be established. In short, Molina's argument misapprehends the implicit relationship between mental or physical incapacitation and consent in the context of a rape charge. In such cases, proof of mental or physical incapacitation, in itself and without more, establishes the absence of consent or willing participation in the context of a rape charge. As such, when seeking a conviction under Code § 18.2-61(A)(ii), the Commonwealth need not independently prove either the absence of consent or an unwillingness

- 15 -

to engage in the sexual act. Nor need there be an express finding by the trier of fact that the sexual act was against the will and without the consent of the victim when the charge is brought under Code § 18.2-61(A)(ii). But, to the extent the Commonwealth was required by the instruction in this case to expressly prove those elements and the jury was required to expressly make such a finding, it does not follow that reversible error occurred as Molina contends. The instruction did nothing more than impose on the Commonwealth a heavier burden of proof in order to convict under Code § 18.2-61(A)(ii). If that be error at all, it favored Molina and was harmless. Pettus v. Commonwealth, 123 Va. 806, 808, 96 S.E. 161, 162 (1918) (instruction erroneously defined crime of storing ardent spirits as storing spirits in any other place than in defendant's bona fide home, although storage in the home was also unlawful; finding error harmless where "error is favorable to the defendant and not against his interest"); see also State v. Duell, 332 S.E.2d 246, 255 (W. Va. 1985) (holding that erroneous instruction was harmless where it "effectively greatened and not lessened" the government's burden of proof).

In summary, we find the trial court's presumed error in combining what should have been given as separate instructions to be harmless.

### B.  GRANTING INSTRUCTION 14 AS TO MENTAL INCAPACITY WAS SUPPORTED BY MORE THAN A SCINTILLA OF EVIDENCE

Finally, Molina claims that Instruction 14 was improperly given on the ground that "no evidence whatsoever [establishes] that Moroffko suffered from a mental impairment such that she was unable to understand the nature and consequences of sexual intercourse."[4] Relying on

---

[4] In his initial objection to Instruction 14, Molina argued that "mental incapacity simply would not apply at this time." He contended that the definition "deals with a mental retardation and matters like that." The following took place:

> THE COURT:  Isn't your argument that this individual with her bipolar problem and use or misuse of controlled substances rendered her in a condition that she can't - - so she consented and now can't remember?

Adkins, he reasons that the evidence only established impaired judgment due to "mood swing and/or drugs and alcohol," and he further argues such impairment does not constitute "mental incapacity" under Virginia law. Molina's claim is without merit.

As noted *supra*, "mental incapacity" is defined by Code § 18.2-67.10(3) as "that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature and consequences of the sexual act involved in such offense and about which the accused knew or should have known." The victim must also be "[in]capable of making a volitional choice to engage or not engage in such conduct." Adkins, 20 Va. App. at 345, 457 S.E.2d at 388.

The evidence shows that, on the day in question, Molina approached Moroffko while she sat on a brick wall drinking wine, and engaged her in conversation. Moroffko recalled that they kissed and that she was then hit on the head with something hard causing her to lose consciousness. She next remembered awakening in the hospital, suffering facial lacerations, broken bones in her face, and a head injury. Koltz found Moroffko behind a bush, nude from the waist down, lying on the ground, unconscious. Koltz tried to revive Moroffko, but she was not responsive. Moroffko was not revived until after she was admitted to a hospital. At trial, Moroffko denied consenting to any sexual activity. Tests disclosed that Moroffko had over twice the normal amount of alcohol in her system and that the level was even higher at the time

---

[DEFENSE COUNSEL]: Yes. That's our theory, that she consented and then - -

THE COURT: And that she can't remember because of mental incapacity.

[DEFENSE COUNSEL]: Yes. That's our theory, that she consented and then - -

Molina's attorney reiterated that mental incapacity is limited to one's "capacity to appreciate the sex act as it applies to [one's] mental retardation."

- 17 -

Molina had intercourse with her. She also tested positive for the presence of cocaine and benzodiazepines. The prescribed medications Moroffko had taken, in combination with her alcohol intake, were described as "deadly" by Molina's expert. The evidence is in sharp contrast to Molina's statement that Moroffko was able to consent to sexual intercourse a short time before the police arrived and provides a sufficient basis from which the jury could conclude that Moroffko had either lost consciousness or was too disoriented to give valid consent before Molina had sexual intercourse with her and remained in that incapacitated state until she awoke in the hospital. The evidence is clearly sufficient to support an instruction on mental incapacity at the time of the alleged rape. See State v. Al-Hamdani, 36 P.3d 1103, 1107 (Wash. Ct. App. 2001) ("It is important to distinguish between a person's general ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences *at a given time and in a given situation*." (emphasis added)), review denied, 60 P.3d 1211 (Wash. 2003); see also State v. McDowell, 427 So. 2d 1346, 1350 (La. Ct. App 1983) (in rape cases, the fundamental question is whether or not the mental condition of the victim is so impaired that legal consent cannot be exercised or given).

Molina's argument that the mental incapacity contemplated by the statute is confined to permanent mental conditions such as retardation ignores the fundamental, operative principle in rape convictions and is unpersuasive. The touchstone of the legal concept is whether the victim has "the capacity to make a volitional choice to engage or not engage in [a sexual] act." Adkins, 20 Va. App. at 346, 457 S.E.2d at 389. The cause underlying the victim's impaired capacity to give consent is not determinative. See State v. Farnum, 554 N.W.2d 716, 721 (Iowa Ct. App. 1996) (recognizing that although incapacity "is generally applied in cases of retarded or

low-functioning victims, it may be applied to a seriously intoxicated victim); Al-Hamdani, 36 P.3d at 1107.[5]

Molina's reliance on Adkins to support his position is misplaced. Adkins does not limit the protections afforded under Code § 18.2-61(A)(ii) to individuals afflicted with mental retardation. Rather, Adkins identifies two classes of individuals who come within the protection of the statute. "The legislative purpose of Code § 18.2-61(A)(ii) is to protect persons who are mentally impaired *or* retarded from being sexually exploited due to their mental incapacity." Adkins, 20 Va. App. at 342-43, 457 S.E.2d at 387 (emphasis added). Furthermore, the term "mentally impaired" is broadly general in nature; no cause of the impairment is identified or allied to the term in Adkins. That one is "impaired," that is one is suffering from a "condition . . . at the time of an offense . . . which [precludes an] understanding [of] the nature and consequences of the sexual act involved," is the crux of the Court's choice of words, not the reason for the impairment. By contrast, impairment by mental retardation is separately identified, distinguishing its more narrow import from the broad import of the term "mentally impaired."

On these grounds, we find that "mental incapacity" includes conditions other than those in which a victim is unable to understand the sex act due to mental retardation and that the phrase "mentally impaired," as used in Adkins, includes mental incapacity induced by voluntary intoxication. We, therefore, cannot say the trial court erred in rejecting the limitation on the statute's reach urged by Molina and in finding the Commonwealth's instruction was supported by more than a scintilla of evidence of mental incapacity based on the victim's intoxication. See

---

[5] For a thorough and expansive examination and discussion of statutes around the country defining victim incapacity and evolving issues in that area, see Patricia J. Falk, Rape by Drugs: A Statutory Overview and Proposals for Reform, 44 Ariz. L. Rev. 131 (2002).

Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (an instruction is proper when it is supported by more than a scintilla of evidence).

ISSUE II: LIMITING DR. MORTON'S TESTIMONY

Background

Molina asserts the trial court erred in limiting the testimony from his final witness, Dr. Morton. Dr. Morton is a psychopharmacologist, not a medical doctor. During his direct examination, Molina's attorney attempted to have him testify about the symptoms of bipolar disease.

Counsel stated:

> [Dr. Morton would be] combining information and basing his opinion on information that we've gotten into evidence and he's going to give the jury his opinion about how Ms. Moroffko would appear to someone - - would appear lucid, impulsive, gregarious and at the same time not remember anything [on the day in question].

Defense counsel further proffered a power point presentation prepared by Dr. Morton defining Bipolar Disorder, listing Bipolar and Psychotic Symptoms, Manic Symptoms, Hypomanic Episode Signs and Symptoms, Psychotic Symptoms, Presentation and Perception of Manic Episode Symptoms, Manic Episodes, Bipolar Responses and Treatment of Bipolar Disorder. According to Molina's attorney, Dr. Morton would use the power point presentation to discuss "why, based on her bipolar disorder [and] medications and various other factors, why her memory would be impaired and that explains to the jury why she's on the one hand saying I was knocked unconscious, but also at the same time has these vague memories, these inconsistent statements."

The trial court concluded that the evidence was cumulative, and furthermore questioned whether Dr. Morton was qualified to testify about bipolar disorder, in general, and manic episodes, specifically, since he was not a medical doctor or Moroffko's treating physician. The

- 20 -

trial court required defense counsel to lay a proper evidentiary foundation for such testimony and pointed out that defense counsel had "had four witnesses . . . capable of testifying to that [issue] and . . . [he] chose not to elicit [the] testimony." The trial court also noted that, although Dr. Morton had training in bipolar disorder, he did not make diagnoses but rather he "work[ed] with doctors that make diagnoses." Finding that Dr. Morton qualified only as an expert in psychopharmacology, the trial court ruled:

> He may not testify that she has bipolar disorder. He may not testify as to any medical disorder of the brain, which is what is supposed to be medical disorder of the brain. He may not testify to that. If he is properly qualified, he may testify as a pharmacologist. If you want to ask him questions of what the effect of these medications might be, you may ask it.
> You may not present this manic episode power point presentation because I think it's clearly outside his expertise. If you want to qualify him you're welcome to do that, but I'm not going to allow you to ask him all kinds of medical questions when he's not a medical doctor, he's not a psychiatrist and you've done that four times with four witnesses and it's cumulative.

Subsequently, defense counsel made further attempts to have Dr. Morton qualified as an expert who could address the symptoms and treatment of bipolar disorder. He explained that such testimony was necessary and relevant "[b]ecause the doctors that we put on can't say how Stephanie Moroffko is [at] times they were not able to see her." Defense counsel argued that Dr. Morton "can testify about the general characteristics of a bipolar person."

> THE COURT: My understanding is that it's your intention to ask this witness what do other bipolar people act like and therefore this witness must have acted that way; correct?
>
> MR. KENSKY: What are the general characteristics - - I want to educate the jury on what are the general characteristics of bipolar and I also want to use Dr. Morton to - - and to ask him about based on if a person has consumed a lot of alcohol, who has cocaine, opiates, other drugs in her blood, based on someone who was taking prescription drugs, how would she appear to another person.

THE COURT: That, I think you may ask because there's a factual foundation. You may not ask the other question of what his medical opinion is about bipolar.

The trial court ruled that Dr. Morton's medical opinion about bipolar disorder "is . . . outside [his area of] expertise . . . and it's too cumulative." We find the trial court did not err in limiting Dr. Morton's testimony on the following grounds: his testimony was 1) beyond the scope of his expertise; 2) cumulative; and 3) speculative. Furthermore Molina failed to proffer Dr. Morton's expected testimony on bipolar disorder generally, or on the disorder as it specifically related to Moroffko at the time of the alleged rape. Finally, contrary to Molina's contention, Dr. Morton was permitted to address how the prescribed drugs and alcohol Moroffko had ingested affected her memory.[6]

### Analysis

"[W]hether a witness is qualified to render an expert opinion is a question submitted to the sound discretion of the trial court." Combs v. Norfolk and Western Ry. Co., 256 Va. 490, 496, 507 S.E.2d 355, 358 (1998). Nevertheless, "[t]he record must show that the proffered expert witness has sufficient knowledge, skill, or experience to render [him] competent to testify as an expert on the subject matter of the inquiry." Id.

Mohajer v. Commonwealth, 40 Va. App. 312, 320, 579 S.E.2d 359, 363 (*en banc*) (2003); see also John v. Im, 263 Va. 315, 319-20, 559 S.E.2d 694, 696 (2002) (admissibility of expert testimony is submitted to the trial court's sound discretion upon application of fundamental principles, including the requirement that the evidence be based on an adequate foundation; we review trial court's ruling for an abuse of discretion). "The fact that a witness is an expert in one field does not make him an expert in another field, even though the two fields are closely related." Combs, 256 Va. at 496, 507 S.E.2d at 358.

---

[6] Among other things, the trial court expressly ruled: "To the extent you want to ask him about the reaction of lithium in those who have been previously diagnosed as bipolar, you're within the range of expertise."

Molina relies upon the Supreme Court's decision in Velazquez v. Commonwealth, 263 Va. 95, 557 S.E.2d 213 (2002), for the proposition that an expert need not be a medical doctor to testify about a medical condition. In Velazquez, the defendant objected to a sexual assault nurse examiner (SANE) testifying "as an expert in the field of sexual assault diagnosis because such diagnosis constitutes the practice of medicine and [the SANE] is not a licensed physician." Id. at 102, 557 S.E.2d at 217. The Supreme Court held that

> a SANE nurse need not be licensed to practice medicine to express
> an expert opinion on the causation of injuries in the context of an
> alleged sexual assault, nor does the expression of such an opinion
> by a SANE in a trial constitute the unlawful practice of medicine.

Id. at 104, 557 S.E.2d at 218 (noting that whether a witness is qualified as expert will not be disturbed "unless it plainly appears that the witness was not qualified"). In Velazquez, the Court reasoned that, although the SANE was not a medical doctor, she was qualified under the facts presented to render an expert opinion concerning the "causation of injuries in the context of an alleged sexual assault." Id. (record showed the SANE had been a nurse for twenty-six years, she underwent special training on sexual assaults and had examined about 500 sexual assault victims).

The Supreme Court later clarified that its

> holding in Velazquez is limited to the unique context of a SANE's
> expert opinion concerning the causation of injuries in a sexual
> assault case, [and] that holding does not change the general rule
> stated above that only a medical doctor may give an expert opinion
> about the cause of a physical human injury.

John, 263 Va. at 321 n.2, 559 S.E.2d at 697 n.2 (citing Combs, 256 Va. at 496, 507 S.E.2d at 358).

To the extent Molina sought to elicit Dr. Morton's testimony that Moroffko's conduct at the time of the incident was consistent with or caused by bipolar disease or any of its phases, particularly, the manic or hypomanic phase, we find such testimony was properly excluded on

- 23 -

the ground that it sought to elicit from Dr. Morton a diagnosis of Moroffko's medical condition at the time of the incident. Such testimony was beyond the scope of Dr. Morton's expertise. Dr. Morton was qualified as an expert in psychopharmacology. As such, he was competent to render an opinion on the effects of drugs in general and the effects of certain drugs on someone diagnosed as having bipolar disorder. In fact, the record shows that Dr. Morton was allowed to testify about the effects of the drugs Moroffko was found to have ingested. Indeed, contrary to Molina's assertions, he was specifically permitted to testify about the effects of certain drugs on Moroffko's ability to remember the events of that evening, particularly in light of the high level of alcohol found in her blood.[7] However, Dr. Morton was not a medical doctor and did not observe or treat Moroffko. Therefore, he was not qualified to testify that Moroffko suffered from bipolar disease or that she exhibited behavior consistent with mania or hypomania at the time of the incident. Such testimony is in the nature of a medical diagnosis that Dr. Morton was not qualified to give.

Molina also asserts that, based on his experience, Dr. Morton was qualified to give testimony generally describing bipolar disease and its various phases. The purpose of such testimony was, in part, to establish that Moroffko's conduct during the incident in question was consistent with the disorder. We find that the testimony Molina sought to elicit was properly excluded. First, testimony about the general characteristics of bipolar disease and its manic or hypomanic phases was cumulative.[8] Second, Molina failed to proffer the details of Dr. Morton's

_____

[7] When Molina's attorney advised the trial court he would like to ask Dr. Morton how someone who consumed a large amount of alcohol, has cocaine in his or her blood and takes prescription drugs would appear to another person, the trial court stated, "That, I think, you may ask because there's a factual foundation."

[8] Dr. Jagoda described the symptoms generally exhibited by an individual in the hypomanic phase of bipolar disease, and they included the very characteristics that Molina sought to elicit from Dr. Morton's testimony. Dr. Jajoda described hypomania as "a state when

- 24 -

intended testimony about the general nature of bipolar disease or the characteristics of the disease in its manic or hypomanic phase and he failed to proffer on what basis Dr. Morton would apply the general characteristics of bipolar disease to Moroffko's conduct at the time of the incident in question. The failure to proffer the expected testimony is fatal to his claim on appeal. "Without such a proffer, [the appellate court] cannot determine the admissibility of the proposed testimony, and, if admissible, whether the court's exclusion of the evidence prejudiced [the party]." Holles v. Sunrise Terrace, 257 Va. 131, 135, 509 S.E.2d 494, 497 (1999); see also Evans v. Commonwealth, 39 Va. App. 229, 236, 572 S.E.2d 481, 484 (2002) (citations omitted). Third, Molina's intended use of Dr. Morton's testimony about the general characteristics of bipolar disease was improper. As he explained to the trial court, Molina sought such testimony from Dr. Morton "[b]ecause the doctors that we put on [earlier] can't say how Stephanie Moroffko is [at] times they were not able to see her." In other words, Molina sought to use Dr. Morton's general description of bipolar disease to establish that Moroffko's conduct at the time of the incident was consistent with the disease and with its manic or hypomanic phase, in particular. As such, it called for speculation and surmise on the part of the trier of fact and was improper. Finally, Molina failed to proffer what evidence regarding the nature and character of Moroffko's behavior during the incident that was to be explained by Dr. Morton's testimony about bipolar disorder and its manic phases. As noted earlier, the failure to proffer the evidence excluded by the trial court's ruling precludes our consideration of the issue. Id.

We cannot say that the trial court abused its discretion in limiting Dr. Morton's testimony to those areas about which he was proficient and competent and in excluding his testimony regarding bipolar disease in general and about Moroffko's medical condition, specifically.

there is decreased need for sleep and increased energy and physical energy and impulsive behavior."

ISSUES III & IV:  SUFFICIENCY OF THE EVIDENCE

Molina contends there was insufficient evidence to support the jury's verdicts finding him guilty of forcible sodomy and rape.

Standard of Review

When the sufficiency of the evidence is challenged on appeal, the appellate court reviews the evidence that tends to support the conviction and upholds the conviction unless it is plainly wrong or lacks evidentiary support.  Code § 8.01-680; Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998).  "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial."  Jenkins, 255 Va. at 520, 499 S.E.2d at 265.  Conflicts in the evidence are resolved by the fact finder, and such conflicts are not revisited on appeal unless "'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion.'"  City of Bedford v. Zimmerman, 262 Va. 81, 86, 547 S.E.2d 211, 214 (2001) (quoting J & E Express, Inc. v. Hancock Peanut Co., 220 Va. 57, 62, 255 S.E.2d 481, 485 (1979)).

> To justify conviction of a crime, it is insufficient to create a suspicion or probability of guilt.  Rather, the burden is upon the Commonwealth to prove every essential element of the offense beyond a reasonable doubt.  "The evidence must exclude every reasonable hypothesis of innocence and be consistent only with the guilt of the accused."

Moore v. Commonwealth, 254 Va. 184, 186, 491 S.E.2d 739, 740 (1997) (quoting Powers v. Commonwealth, 211 Va. 386, 388, 177 S.E.2d 628, 629 (1970)) (citations omitted).  "Whether an alternative hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong."  Archer v. Commonwealth, 26 Va. App. 1, 12-13, 492 S.E.2d 826, 832 (1997).

Rape

Moroffko was rendered unconscious while speaking with Molina. When emergency personnel arrived, Moroffko was unconscious and nonresponsive and Moroffko did not regain consciousness until she was in the hospital. Molina's DNA was found in Moroffko's vaginal cavity, and she denied consenting to have sexual intercourse. The jury, as fact finder, believed Moroffko and rejected appellant's self-serving statement to Detective Kelly that he and Moroffko had consensual intercourse. "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986). The jury had competent, credible evidence with which to find appellant guilty of rape. Under these facts, we cannot say the jury's verdict is plainly wrong or lacked evidentiary support. Accordingly, we find that the trial court did not err in refusing to strike the evidence relating to the rape.

Forcible Sodomy

Molina argues that, because Moroffko "does not know what happened to her," the forcible sodomy verdict rested entirely on speculation. Moroffko testified that "something" or "someone" hit her while she was talking with Molina, causing her to lose consciousness. Test results disclosed that Molina's DNA was found inside Moroffko's anal/rectal cavity, and Moroffko denied consenting to having any sexual relations. DNA evidence excluded Membrano, the only other person on the scene, as a contributor. Molina's claim that his seminal fluid was transferred to Moroffko's anal/rectal cavity by Membrano was ostensibly rejected by the trier of fact who is charged with crediting and weighing the evidence. Williams v. Commonwealth, 24 Va. App. 577, 582, 484 S.E.2d 153, 155 (1997) (noting that jury's function is to weigh the evidence and resolve all factual issues). Finally, the jury believed Moroffko and rejected the self-serving denials and explanations that Molina gave to Detective Kelly. See id.

(jury also charged with judging witness credibility). We find that sufficient evidence in the record supports the jury's verdict, and we cannot say the trial court erred in refusing to strike the evidence on forcible sodomy.

For the reasons stated, we affirm the trial court.

<u>Affirmed.</u>

Benton, J., dissenting.

I would reverse the jury's convictions of Jaime Salvador Molina for rape and sodomy and dismiss the indictment because the evidence was insufficient to prove the offenses. I also believe that the convictions were improperly rendered because the trial judge erred by limiting the testimony of an expert witness on an issue of critical significance to Molina's defense and by improperly instructing the jury on three disjunctive theories of rape.

I.

At trial, the Commonwealth contended that Molina rendered the complaining witness unconscious by hitting her with some object, abducted her, and raped her. A jury instruction allowed the jury to convict Molina of rape under Code § 18.2-61(A) if he had sexual intercourse with the complaining witness "against her will and without her consent; and . . . by force, threat or intimidation; or by the use of her mental incapacity or physical helplessness." At the conclusion of the evidence, the trial judge found the evidence was insufficient to prove malicious wounding and abduction, and he struck those charges. I would hold that the evidence was also insufficient to support a conviction for rape. Even if we disregard Molina's statement that the two had consensual sexual intercourse, what occurred after Molina and the complaining witness kissed, hugged, talked about sexual things, and went behind the store was mere conjecture and speculation based on inconclusive evidence.

Our review of the sufficiency of the evidence in this case is guided by a well-settled principle.

> "[I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both

- 29 -

the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. . . ."

But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.

Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977) (quoting LaPrade v. Commonwealth, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950)). This is so because, as a matter of constitutional law, the Due Process Clause protects an accused from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). In other words, the evidence must exclude every reasonable hypothesis of innocence and, therefore, it is insufficient to support a conviction when it creates merely a suspicion or probability of guilt. Yarborough v. Commonwealth, 247 Va. 215, 218, 441 S.E.2d 342, 344 (1994); Burrows v. Commonwealth, 224 Va. 317, 320, 295 S.E.2d 893, 895 (1982); Hyde v. Commonwealth, 217 Va. 950, 954-55, 234 S.E.2d 74, 77-78 (1977).

The Commonwealth failed to prove an unbroken "chain of necessary circumstances" to establish Molina's guilt to the exclusion of other hypotheses. According to the prosecutor's theory, Molina hit the complaining witness on the head with some object, rendering her unconscious, then moved her behind a convenience store, raped her, and forcibly sodomized her. Yet, the complaining witness never testified that Molina did any of those things. The record contains ample evidence, including the complaining witness' admissions, that she did not recall all the events that occurred after she met Molina. She has a bipolar disorder and could only recall that at some point she was unconscious from a seizure. She had a history of mixing prescription drugs, illegal drugs, and alcohol, and a history of similar seizures. Simply put, the

evidence was insufficient to prove beyond a reasonable doubt the Commonwealth's theories of forcible rape and sodomy.

Significantly, the complaining witness gave conflicting testimony that was vague, malleable, and not specific as to the events that transpired. The complaining witness testified that she sat on a wall beside a convenience store at ten o'clock in the morning and drank the entire bottle of wine she had just purchased. A "brick column [was] right behind" her perch on the wall. After drinking the wine, the complaining witness drank milk and talked with Molina about her life. During this conversation, she and Molina engaged in mutual hugging and kissing. The following events are the extent of her direct testimony regarding what happened as she sat on the wall:

> A: A gentleman approached me . . . . He sat down next to me and started talking to me.
>
> Q: Did you know who that person was?
>
> A: No.
>
> Q: Did you speak with him?
>
> A: Yes.
>
> Q: What happened after you spoke with him?
>
> A: We spoke for awhile. The next thing I remember is my head being hit by something hard.
>
> Q: Where were you when your head was hit by something hard?
>
> A: Sitting on the bricks.
>
> Q: Do you know who hit you in the head?
>
> A: No.

On cross-examination, the complaining witness disclosed she was speculating about what actually occurred.

Q: . . . You're telling us that you don't know how it was that you lost consciousness. Correct?

A: I was hit with something --

Q: But you never saw --

A: -- or hit against something.

Q: You never saw anything hit you. Is that fair to say?

A: No.

Q: And you never saw any person with anything that hit you. Right?

A: No.

She testified that she did not remember anything from that point until she awoke in the hospital. She also told the jury she does not know where she was when she lost consciousness. She acknowledged, however, that in the hospital shortly after the incident she gave another version.

Q: But you told the detectives at least once during one of your tape recorded statements that you remember banging your hand or your head while one person was there and then that person left.

Then another person came, and it was after that person came that you lost consciousness. Remember that?

A: That's how it happened.

The complaining witness and her physician testified she has a bipolar disorder with both depressive and manic episodes. The complaining witness also admitted she was prone to seizures after using drugs and alcohol. These seizures resulted in periods when she would blackout, that is, when she had no memory of events. During a period in July (two months before the incident), the complaining witness was admitted to a psychiatric hospital for overdosing on Xanax, Oxycodone, Doxepine, Thorazine, and alcohol. Abundant evidence proved she had been misusing her prescription medications in the months prior to the morning she met Molina.

- 32 -

The complaining witness' treating physician testified that she had a history of hypomania -- "a state when there is decreased need for sleep and increased energy and physical energy." She also testified that the complaining witness reported times when she had not slept over a period of several days. Although the complaining witness testified at trial that she was at home the night before the incident, she admitted to the officers who questioned her at the hospital that she had been in Washington, D.C., all night before the morning she went to the convenience store. That night, the complaining witness had ingested undisclosed quantities of "Xanax, Zanaflex, . . . Lithium, Zoloft, Zethacoat(ph), and Nexium."[9] She made these admissions only after the officers learned from her father that she had not returned home at night.

The evidence proved that in addition to those drugs she drank alcohol the day of this incident and suffered a seizure. Although her doctors had instructed her not to combine her prescription medications with alcohol, she testified that the morning after ingesting the drugs she purchased a bottle of wine at the store and drank all of it. Indeed, at different points in her testimony, she admits that she drank beer, a bottle of wine and/or a wine cooler. A blood test at the hospital revealed that the alcohol content in her blood was 292 mg/dL when measured. A textual footnote on the blood test report indicates a depression of the central nervous system when a reading is "greater than 100 mg/dL" and "fatalities reported: greater than 400 mg/dL."

The complaining witness could not recall which drugs she took that morning before consuming the alcohol. She testified as follows:

> The day of September 28th, I hadn't taken anything. I don't know if I had taken my regular medication or not, but if I had it was what was prescribed.
>
> And I drank just the wine that I said I drank and had a seizure, so it was not just because of my pills or the alcohol.

---

[9] It is likely that "Zethacoat(ph)" refers to Depakote, a drug used to treat mania associated with bipolar disorder and to treat seizure disorders.

The blood tests showed, however, that she tested positive for benzodiazepines, an opiate, and cocaine and that she had a much lower level of lithium in her body than normally prescribed for her diagnosis of bipolar disorder. In addition, the para-medical technician who examined her at the convenience store reported foam around her mouth, which was evidence of a seizure.

The complaining witness claimed to have suffered facial lacerations, broken bones in her face, and "some type of injury" to her head that bled profusely. However, the para-medical technician, who testified that she is trained to accurately record any injuries and that she attended the complaining witness for a substantial length of time, told the jury she did not notice any injury other than some puffiness in the complaining witness' face. The complaining witness also testified she told the police she may have sustained those injuries before going to the store that morning.

Moreover, the Commonwealth's witnesses contradicted the complaining witness' testimony in other significant aspects. A police officer who interviewed the complaining witness after she was examined in the hospital testified that the complaining witness was conscious and responsive and that she gave a different version of the events in the hospital. She told the officer that while she was sitting on the wall, she and the man talked "about sexual things." She also said she walked away from the wall and struck her face on a tree. In addition, she told the officer she was conscious when she was having sexual intercourse.

The officer who interviewed the complaining witness also interviewed Molina. Molina said the complaining witness talked to him about her family and her life before saying she wanted to have sexual intercourse with him. They went to the rear of the store where "she laid down" and pulled him down upon her. He denied having anal intercourse with her. According to Molina, when they finished having sexual intercourse she said she wanted to stay there and sleep. He also said he left her, later returned, and then saw another man atop her.

A repetition of the complaining witness' testimony graphically demonstrates that she told the detectives at the hospital a version of events that was consistent with Molina's statement.

> Q: But you told the detectives at least once during one of your tape recorded statements that you remember banging your hand or your head while one person was there and then that person left.
>
> Then another person came, and it was after that person came that you lost consciousness. Remember that?
>
> A: That's how it happened.

Indeed, when the police arrived behind the store, Molina was standing, fully clothed and another man was on the ground beside the complaining witness.

The evidence does not exclude the hypothesis that the complaining witness voluntarily went behind the store after hugging and kissing Molina and engaging in conversation about sexual activity. She consented to sexual intercourse with Molina, then had a seizure and lost consciousness after Molina left and before the other man arrived. Indeed, the trial judge found that the evidence was insufficient to prove Molina either wounded her or abducted her.

Simply put, the evidence, including the complaining witness' own testimony, established she did not accurately remember the events that led to her having sexual intercourse because of her drug and alcohol abuse and the effects of those substances on her bipolar disorder.

> Q: You've just told us that you have a history of having seizures. Right?
>
> A: It happens.
>
> Q: You've told us that you have a history of when you drink, you don't remember things sometimes.
>
> A: Yes.
>
> Q: And you told us that when you take pills you don't remember things some times?
>
> A: Yes.

Q: You told us you have a history of taking too many drugs. Right?

A: Yes.

Q: Too much alcohol?

A: Yes.

Q: The detectives were asking you questions [the same day of the incident] and you were having trouble remembering some of the things that supposedly happened that day. Right?

A: At the time they were asking me questions, yes.

        \*      \*      \*      \*      \*      \*      \*

Q: . . . [W]ould it be fair to say that when you were speaking with the detectives there were various points where they would ask you questions about what happened and you would have a problem recalling what had happened, and you couldn't answer.

A: Yes.

Q: The same problem you've had today?

A: Yes.

Q: The same problem you had at the preliminary hearing?

A: Yes.

At the close of the evidence, the Commonwealth argued to the jury that the complaining witness "was beaten that day, that she was beaten to the point where she was unconscious and that she was raped and sodomized." Yet, the Commonwealth failed to disprove the reasonable hypothesis, supported by the evidence, that the complaining witness consented to sexual intercourse with Molina and that, as a result of later "blacking out" from the effect of drugs and alcohol on her bipolar disorder, she had no accurate memory of the events. The complaining witness did not testify that Molina hit her on the head or otherwise used force, threat or intimidation when interacting with her; she specifically testified that Molina never made any threats toward her. Indeed, at trial she said she "was hit with something . . . *or hit against*

- 36 -

*something*," but did not attribute this to Molina. The jury was left to speculate about what

occurred because the Commonwealth presented no physical evidence showing forcible

penetration and provided no coherent chain of events showing that Molina raped the complaining

witness. The complaining witness kissed and hugged Molina and talked "about sexual things"

before having sexual intercourse with him. The evidence left the jury to speculate when, during

the events behind the store, the complaining witness became unconscious. Though she testified

at trial that she did not remember having sexual intercourse, she told the officers in the hospital

the day of the event that she was conscious while having sexual intercourse. Thus, I would hold

that no evidence proved Molina acted against her will and no evidence proved forcible

penetration.

I believe the jury was misled by an instruction that the Commonwealth offered which

provided in the disjunctive two additional theories under Code § 18.2-61 to convict of rape: that

the rape was accomplished through the complaining witness' physical helplessness or that the

rape was accomplished through the complaining witness' mental incapacity. No evidence

proved the complaining witness suffered from physical helplessness or from mental incapacity

when she engaged in sexual intercourse with Molina.

With regard to proof of physical helplessness in a rape charge, we have made an

important distinction between being physically unable to communicate at the time of the

intercourse and physically unable to communicate afterward. Howard v. Commonwealth, 21

Va. App. 473, 465 S.E.2d 142 (1995). In Howard, the complaining witness lost consciousness

shortly after having intercourse. Id. at 476, 465 S.E.2d at 143. We explained as follows:

> The Commonwealth asserts that the trial court reasonably could
> have inferred physical helplessness from the fact the victim went to
> a neighbor's apartment shortly after the alleged incident, partially
> clothed, before vomiting and collapsing. The Commonwealth
> highlights the fact that the victim could not recognize her parents
> for a period of hours and passed in and out of consciousness after

being taken to the hospital, where doctors determined she was intoxicated. However, assuming the victim was intoxicated to the point of being physically unable to communicate at the time she exited the apartment, this does not prove she was intoxicated to the same degree when she engaged in sexual intercourse with appellant. Even in conjunction with other evidence, the Commonwealth's case was not strong enough to prove appellant's guilt beyond a reasonable doubt. In so holding, we find the following admonition appropriate: "[t]he conduct of [appellant] cannot be condoned. It was disgraceful. It was enough to shame one steeped in moral infamy. But he was not tried for that. Rape was the charge laid at his door and the Commonwealth's evidence fail[ed] to sustain it."

Id. at 480-81, 465 S.E.2d at 145-46 (citations omitted).

In this case, the Commonwealth argued to the jury that the complaining witness "was beaten to the point where she was unconscious and [then] . . . raped and . . . sodomized." No evidence proved Molina beat her or assisted in beating her. Significantly, the trial judge found that the evidence failed to prove malicious wounding and struck that charge. In the absence of evidence, the jury had to speculate to conclude that the complaining witness was physically helpless when she was having intercourse. She admitted to the detectives that she was conscious while having sexual intercourse. By her own admission, when she mixed alcohol and her prescribed medication, she was prone to seizures and to blackouts that caused her to be unable to remember events. She testified that on the day at issue, she drank wine, took drugs whose names she could not recall, and had a seizure. The evidence failed to disprove that her use of drugs and alcohol caused her failure to remember and that her lapse into unconsciousness occurred after she had sexual intercourse with Molina.

The Commonwealth never argued at trial that the complaining witness was mentally incapacitated. "Mental incapacity" is a statutory term that does not connote the ordinary meaning; it is defined as "that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature

- 38 -

or consequences of the sexual act involved in such offense and about which the accused knew or should have known." Code § 18.2-67.10(3). As we explained, in <u>Adkins v. Commonwealth</u>, 20 Va. App. 332, 342-43, 457 S.E.2d 382, 387 (1995), the statute exists "to protect persons who are mentally impaired or retarded from being sexually exploited due to their mental incapacity." A person is mentally incapacitated only when "he or she has a mental 'condition' that 'prevents' the person from being able to 'understand' either the 'nature' or 'consequences' of engaging in sexual intercourse." <u>Id.</u> at 344-45, 452 S.E.2d at 387. Thus, we explained as follows:

> To "know, apprehend, or appreciate" the "nature and consequences" of sexual intercourse can range from a simple understanding of how the act of coitus is physically accomplished together with an understanding that a sensation of pleasure may accompany the act, to a thorough and comprehensive understanding of the complex psychological and physiological "nature" of "the sexual act involved" and that, aside from immediate gratification, the act may have dire familial, social, medical, physical, economic, or spiritual consequences.

<u>Id.</u> In other words, to obtain a conviction under the statute, "the Commonwealth must prove . . . that the person does not understand 'the nature and consequences of the sexual act involved.'" <u>Id.</u> at 343, 457 S.E.2d at 387. <u>See also</u> <u>White v. Commonwealth</u>, 23 Va. App. 593, 597, 478 S.E.2d 713, 715 (1996).

The Commonwealth's argument to the jury during opening and closing arguments is devoid of any suggestion that Molina accomplished the rape or sodomy through the use of the complaining witness' mental incapacity. Indeed, the Commonwealth never offered evidence to establish that the complaining witness was not able to understand the nature and consequences of sexual intercourse within the meaning of Code § 18.2-61(A). The Commonwealth's own witness testified that the complaining witness said she was kissing and hugging Molina and discussing "sexual things." Furthermore, no evidence proved Molina knew or should have known the complaining witness was not comprehending the nature of the sexual acts. Thus, the

jury could not find beyond a reasonable doubt mental incapacity because no evidence in the record supported such a finding.

Simply, the complaining witness testified she was unable to recall what occurred. Beyond the presence of Molina's semen, which equally supported the hypothesis that the sex was consensual, there was no physical evidence of rape. If one disregards Molina's testimony that the two had consensual sex, what occurred when Molina and the complaining witness went behind the store could only be discerned by conjecture and speculation. Conviction on this circumstantial evidence that raises only suspicion and speculation is precisely what Clodfelter prohibits. 218 Va. at 623-24, 238 S.E.2d at 822. "'Suspicion . . . no matter how strong is insufficient to sustain a criminal conviction.'" Commonwealth v. Smith, 259 Va. 780, 784, 529 S.E.2d 78, 79 (2000) (quoting Stover v. Commonwealth, 222 Va. 618, 624, 283 S.E.2d 194, 197 (1981)).

## II.

For these same reasons, I would reverse the conviction for sodomy. The indictment alleged that anal intercourse occurred and was committed "by force, threat or intimidation." However, no evidence proved penetration of the anal cavity occurred. A nurse who interviewed and examined the complaining witness at the hospital found only minor abrasions in the genital rectal area that were not visible to the naked eye. The nurse's written report required her "to check off a box under anal contact" and listed the options "yes, no, attempt, or unknown." The nurse checked "no." In contrast, she checked "yes" for "vaginal contact" and notes "penis." This report is consistent with Molina's admission that they engaged in vaginal intercourse but not anal intercourse.

The evidence merely established that a rectal anal swab revealed the presence of Molina's DNA; however, the evidence also established that semen can be transferred to various

- 40 -

body parts during the act of sexual intercourse. The jury had to speculate that anal intercourse occurred between Molina and the complaining witness. A verdict "based only upon speculation and conjecture . . . cannot be permitted to stand." Dunn v. Commonwealth, 222 Va. 704, 706, 284 S.E.2d 792, 793 (1981).

III.

I would hold that the trial judge's limitation on Dr. William Alexander Morton's testimony was reversible error. Molina's defense was that the complaining witness had consented to the sexual intercourse. He was prepared to offer the testimony of an expert concerning the behavioral effects of prescription drugs, illegal drugs, and alcohol on a person with a bipolar disorder. Molina's attorney proffered that Dr. Morton has a PhD in pharmacy, is a professor of pharmacy, and is an assistant professor of psychiatry in behavioral science. Dr. Morton would have explained how the complaining witness "could appear to be lucid, impulsive, and gregarious," yet be unable to remember her behavior.

The trial judge limited Dr. Morton's testimony to the effects of alcohol and drugs without reference to bipolar disorder, ruling that Dr. Morton is not a "medical doctor" and, thus, could not refer to the complaining witness' bipolar disorder. This was reversible error. The record proved that Dr. Morton is an expert in the field of "psychopharmacology, which is [the study of] how drugs affect the brain."

> The sole purpose of permitting expert testimony is to assist the trier of fact to understand the evidence presented or to determine a fact in issue. Generally, a witness is qualified to testify as an expert when the witness possesses sufficient knowledge, skill, or experience to make the witness competent to testify as an expert on the subject matter at issue. Sami v. Varn, 260 Va. 280, 284, 535 S.E.2d 172, 174 (2000); Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). "An expert's testimony is admissible not only when scientific knowledge is required, but when experience and observation . . . give the expert knowledge of a subject beyond that of persons of common intelligence and ordinary experience. The scope of such evidence extends to any subject in respect of

- 41 -

> which one may derive special knowledge by experience, when [the witness's] knowledge of the matter in relation to which [the witness's] opinion is asked is such, or is so great, that it will probably aid the trier [of fact] in the search for the truth." Neblett v. Hunter, 207 Va. 335, 339-40, 150 S.E.2d 115, 118 (1966); cf. Code § 8.01-401.3. In essence, all that is necessary for a witness to qualify as an expert is that the witness have sufficient knowledge of the subject to give value to the witness's opinion. Norfolk & Western Railway Co. v. Anderson, 207 Va. 567, 571, 151 S.E.2d 628, 631 (1966).

Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002).

The record proved that Dr. Morton's specialized field is psychopharmacology, and he studies the effects of prescription and illegal drugs, as well as alcohol, on thinking and behavior. He is not, as the trial judge seemed to insist, merely "a pharmacist." He has extensive experience in treating, evaluating, and studying the effects of drugs and alcohol on behavior. He is a professor of pharmacy and assistant professor of psychiatry in behavioral science at the University of South Carolina. In that setting, he "work[s] with psychiatrists and other pharmacy students, medical students, instructing them what to expect from various drug therapies." He is board certified in the "fairly specialized" area of psychiatric pharmacy practice. At the time of the trial, he was working in a general and psychiatric clinical practice where patients undergo drug and alcohol treatment in an "in patient unit." In addition to his extensive experience in the field generally, Dr. Morton has studied and dealt specifically with the effects of lithium on persons diagnosed with bipolar disorder. He has written numerous publications (forty-six) in the field of lithium and bipolar disorder, "looking at how to monitor and utilize lithium and . . . in the area of treatment of bipolar disorder, as well as . . . other areas of psychopharmacology." He has established several lithium clinics, one of which was specifically for persons with bipolar disorder, and, for eighteen years, he worked in clinics where he saw from 200 to 280 patients on a regular basis. He worked as a consultant on a regular basis for drug and alcohol programs, and he was a regular faculty member in a setting where he saw patients and made recommendations

on their drug therapies. In his practice, he consulted with physicians who needed to ascertain if and what kind and dosage of drugs a patient should take. In certain cases, he was the primary care practitioner for patients who had been diagnosed with bipolar disorder.

The Supreme Court has unequivocally held, "we will reverse a holding that a witness is not qualified to testify as an expert when it appears clearly from the record that the witness possesses sufficient knowledge, skill, or experience to make him competent to testify as an expert on the subject matter at issue." Sami, 260 Va. at 284, 535 S.E.2d at 174. The record proves that Dr. Morton was qualified to give an opinion about the effects of drugs and alcohol on a bipolar person who combined alcohol with drugs. Other experts and the complaining witness' own testimony established that she suffered from a bipolar disorder and that she had taken lithium, other prescription drugs in unprescribed overdoses, illegal substances, and alcohol. Dr. Morton's breadth of experience, which included lengthy and extensive clinical experience, treatment of patients, and knowledge of the effects of prescription and illegal drugs on the behavior of individuals diagnosed with bipolar disorder, satisfied the requirements for expert testimony.

The trial judge erred by requiring that Dr. Morton be a medical doctor to testify as to the effect of drugs and alcohol on persons with a bipolar disorder. As Molina correctly notes, the Supreme Court has allowed a nurse to testify about the causation of physical injuries of rape victims, even though a nurse is not a licensed physician, because "it has long been accepted that nurses and other healthcare professionals with the proper training, expertise, and experience are qualified to give expert opinions on medical causation in appropriate circumstances." Velazquez, 263 Va. at 103-04, 557 S.E.2d at 218. Dr. Morton is an expert in the field in which he was called to testify, psychopharmacology.

This error was not harmless. Dr. Morton's expertise included evaluating the effects of a number of illicit and prescribed drugs, in varying amounts, and alcohol on the behavior of persons with bipolar disorder. His testimony was critical to Molina's defense. Dr. Morton's testimony about the effects of alcohol, cocaine, and other substances on the complaining witness' bipolar disorder would have allowed the jury to infer that she could have appeared quite normal (and consenting) to Molina, yet have no memory of engaging in sexual intercourse. The exclusion of his testimony left the jury uninformed about the effect of the combination of the drugs and alcohol on the behavioral pattern and memory of a bipolar person whose lithium level was abnormally low. This was a matter beyond the understanding of lay persons. By excluding the testimony, the trial judge deprived Molina of evidence of a factual basis upon which the jury could have decided in Molina's favor.

IV.

I would also hold that the trial judge erred in granting Instruction 14, which reads as follows:

> The Court instructs the jury that the defendant is charged with the crime of rape. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That the defendant had sexual intercourse with [the victim] who was not then the defendant's spouse; and
>
> (2) That it was against her will and without her consent; and
>
> (3) That it was by force, threat, or intimidation; or by the use of mental incapacity or physical helplessness.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty . . . .

This instruction erroneously combined the elements of "against her will and without her consent" with the elements of "mental incapacity or physical helplessness" in a way not contemplated by the rape statute. In pertinent part, Code § 18.2-61(A) provides as follows:

- 44 -

> If any person has sexual intercourse with a complaining witness . . . and such act is accomplished (i) against the complaining witness's will, by force, threat or intimidation of or against the complaining witness . . . or (ii) through the use of the complaining witness's mental incapacity or physical helplessness . . . he or she shall be guilty of rape.

Thus, the statute defines three distinct circumstances of sexual intercourse: (i) against a person's will by force (or threat or intimidation), (ii) through the use of the person's mental incapacity, and (iii) through the use of the person's physical helplessness.

The jury asked questions that reasonably suggested that the melding of these elements in one instruction created confusion. For example, the jury wrote to the judge the following inquiry:

> Assumption: The defendant and the victim could be in the same mentally incapacitated state at the time of the incident.
>
> Issue:
>
> (1) Based on the assumption, does Virginia Law specify whether a defendant would be <u>expected</u> to render a <u>rational</u> decision as to the state of mental capacitation and incapacitation of the woman whom he desires to engage in a sexual act?
>
> (2) Per se, are two adults, one male and one female, that are mentally incapacitated at the time of the sexual encounter engaged in an act of "rape"?

These inquiries are significant because the instructions the trial judge gave to the jury did not require the jury to find that the complaining witness was either mentally incapacitated or physically incapacitated. The Commonwealth offered, and the judge gave, an instruction that permitted the jury to convict Molina upon a finding of Molina's "use of mental incapacity." Significantly, the Commonwealth never argued that the complaining witness was mentally incapacitated. In other words, the jury could have found that the complaining witness was intoxicated and that Molina, who was also intoxicated, was guilty of rape because he engaged in sexual relations with her without the use of force, threat, or intimidation, but at a time when he

- 45 -

was mentally unable to comprehend her intentions. The jury gave an indication it was considering this when it inquired whether "the defendant and the victim could be in the same mentally incapacitated state at the time of the incident." It is certain that "the same . . . state" the jury addressed was intoxication because it is undisputed that the evidence proved both Molina and the complaining witness were similar in this respect -- they both consumed alcohol at "the time of the incident."

We have held that a complaining witness is not rendered physically helpless or mentally incapacitated solely because "she was 'drunk' . . . [and] was taking 'antidepressant' medication that day." Howard, 21 Va. App. at 476, 465 S.E.2d at 143. Yet, the instruction in this case permitted the jury to substitute for the "force, threat or intimidation" element its belief that the complaining witness' will was overcome merely because she was voluntarily intoxicated. Indeed, the jury, which specifically had indicated to the trial judge its lack of unanimity, asked: "Can you define 'against her will?' Consent is defined . . . but 'will' is not." The jury's focus on the issue of complainant's "will" is also evident by its further inquiry:

> Element (8): "That it was against her will; and"
>
> Issue:
>
> (1) Under Virginia law, does Element (8) mean that the victim was or could be in a mental state that could prevent her from rendering a rational decision as to her will?
>
> (2) Under Virginia law, does the act of exercising one's "will" directly involves or implies a process of decision making?

The jury's focus on the complaining witness' consent and will was compromised by the instruction's disjunctive use of three distinct circumstances of sexual intercourse. I disagree with the majority opinion's conclusion that the instruction, which intertwined the three theories of rape, was harmless. The Commonwealth never argued that the complaining witness was mentally incapacitated. Yet, the instruction placed before the jury a basis upon which to

- 46 -

impermissibly use the complaining witness' intoxication. Furthermore, as the instruction is crafted, it is impossible to determine whether the jury was unanimous on any one of the instruction's theories of the event. Fewer than twelve jurors could have believed the complaining witness was raped by threat, force, or intimidation (a theory that was submitted to the jury even though the trial judge struck the wounding and abduction charges). Others could have believed that the complaining witness was conscious during intercourse (as she told the officers) and that the rape was accomplished while she was intoxicated (that is, according to the jurors' inquiry, "in the same mentally incapacitated state" as Molina). Others could have found that the complaining witness' intoxication equated with mental incapacity or physical helplessness. It is not possible to tell which set of facts the jury agreed on.

"Under established Virginia law, the verdict in all criminal prosecutions must be unanimous." Evans v. Commonwealth, 228 Va. 468, 481, 323 S.E.2d 114, 121 (1984) (citing Rule 3A:17(a)). The requirement of unanimity means that the jury must unanimously find each element exists. See Richardson v. United States, 526 U.S. 813, 817-18 (1999).

> The Supreme Court explained in Richardson that, for example, the jury must unanimously find force as an element of the crime of robbery, but whether the force is created by the use of a gun or a knife is not an element of the crime and therefore does not require jury unanimity.

Jackson v. Commonwealth, 266 Va. 423, 434-35, 587 S.E.2d 532, 541 (2003) (citing Richardson, 526 U.S. at 817). In this case, however, the question is not "which of several possible sets of underlying brute facts make up a particular element." Richardson, 526 U.S. at 817. Rather, this is a case where the elements of "against [a person's] will" or "through . . . mental incapacity" or "through . . . physical helplessness" are three conceptually distinguishable concepts that are independent elements of the same crime. Because the jury had a menu of permissible ways to convict, the verdict failed to show that the jury reached unanimity on one set

of facts.  Thus, the Commonwealth failed to prove "every *fact* necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. at 364 (emphasis added).  We have no basis to know from the record what essential element the jury found.  Therefore, I would hold that the instruction was erroneous, failed to properly inform the jury of the law, and was not harmless.

For all of these reasons, I would reverse the convictions.