COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Humphreys and Russell
Argued at Leesburg, Virginia


SAMIRA AIT SITAHAR
                                                    MEMORANDUM OPINION* BY
v.      Record No. 0349-19-4              JUDGE WESLEY G. RUSSELL, JR.
                                                    NOVEMBER 26, 2019
LOAY AL-JAWAHIRY


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

Sachin Kori (Rachel M. Fierro; Michelle A. Wahab; Fierro & Kori,
PLLC, on briefs), for appellant.

Angela Morehouse (The Irving Law Firm, on brief), for appellee.


Samira Ait Sitahar (mother) appeals rulings of the circuit court pertaining to the custody of

and visitation with the parties' child.  She specifically challenges the circuit court's exclusion of

certain evidence at trial, including her testimony in her case-in-chief; its consideration and balancing

of the evidence in light of the statutory factors; its granting Loay Al-Jawahiry (father) final

decision-making authority in cases of disagreement; its reducing her custodial time with the child;

and its award of attorney's fees to father.  Father seeks attorney's fees on appeal.  Finding no error,

we affirm the rulings of the circuit court; we deny father's request for attorney's fees.

BACKGROUND

On appeal, we review the facts in the light most favorable to father, granting him all

reasonable inferences that can be drawn from the evidence, because he was the prevailing party

below.  Geouge v. Traylor, 68 Va. App. 343, 347 (2017).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

The parties were married in 2009, and a child was born of the marriage on March 17, 2014. The parties separated in December 2014. On July 17, 2015, the circuit court entered an order governing custody and visitation of the child. The parties were awarded joint legal custody and shared physical custody whereby the child was with father from Sunday afternoon through Wednesday afternoon and with mother the remainder of the time. Additional time was awarded to both parents on their respective birthdays. Father was made responsible for transporting the child for exchanges until mother obtained a driver's license. The parties were divorced by final decree dated February 13, 2017.

In May 2018, a dispute related to the then-four-year-old child's education arose, and mother filed with the circuit court a *pro se* pleading seeking its intervention. At the time, the child was attending pre-school at Crème de la Crème on father's custodial days and King Abdullah Academy, where mother was employed as a teacher, on mother's custodial days. Mother wanted the child to attend her school every day. On June 6, 2018, mother, now with the aid of counsel, filed a more formal petition to modify custody and visitation. Mother asserted numerous grounds in support of her petition, including instances of hygiene and health concerns, allegedly baseless reports by father to child protective services (CPS), her change in employment and residence, and father's being "difficult when addressing co-parenting issues." Mother requested that she be awarded sole legal custody and primary physical custody allowing for every-other-weekend visitation by father.

A scheduling order was entered on June 27, 2018. The order set a three-day trial for November 26 to 28, 2018, and established discovery and pre-trial motion deadlines. Paragraph II of the scheduling order directed that "[t]he parties shall complete discovery . . . by thirty (30) days before the applicable trial date; . . . '[c]omplete' means that all interrogatories . . . must be served sufficiently in advance of trial to allow a timely response at least 30 days before" trial. The order imposed on the parties "a duty to seasonably supplement and amend discovery." Paragraph V

ordered that "[c]ounsel of record shall exchange fifteen (15) days before the applicable trial date a list specifically identifying each exhibit to be introduced at trial . . . and a list of witnesses proposed to be called at that trial." The order also provided that "[a]ny exhibit or witness not so identified and filed will not be received in evidence" unless it be offered "in rebuttal or for impeachment" or "unless [its] admission . . . would cause no surprise or prejudice to the opposing party and the failure to list the exhibit or witness was through inadvertence."

By cross-petition filed October 12, 2018, father also sought to modify the 2015 order; he requested that he be granted primary physical custody and that mother be awarded "reasonable weekend visitation." Father alleged several material changes in circumstances warranting the modification, including "mother's demeaning and false allegations against father" and "mother's refusal to co[-]parent with father." Father further alleged that mother was not allowing telephone contact with the child during her custodial time. Father's petition was scheduled to be heard by the circuit court in conjunction with mother's petition at the November trial, and the parties proceeded with discovery.

Mother provided her responses to father's interrogatories on October 24 and November 2, 2018.[1] In an interrogatory, father requested that mother identify every "person" she might call as a

---

[1] Because they were not offered into evidence before the circuit court, the referenced discovery documents are not part of the trial record. Rule 4:8(e). Mother filed a motion in this Court asking that we "supplement[] the trial record" and nonetheless consider them as part of our review. We denied the motion by order dated July 31, 2019; accordingly, the actual content of the interrogatories and mother's responses, although included in the joint appendix, are not part of the record on appeal and not before us. See Rule 5A:7(a)(6). "[B]asic principles of appellate review, [dictate that] we may not go beyond the record developed in the trial court." Nelson v. Middlesex Dep't of Soc. Servs., 69 Va. App. 496, 502 (2018) (quoting Boyd v. Cty. of Henrico, 42 Va. App. 495, 505 n.4 (2004) (en banc)). Nevertheless, given statements of the circuit court and counsel for the parties that are part of the record, we are able to conclude that father propounded an interrogatory seeking the identity of each person mother might call as a witness and a general description of the substance of the testimony each person so identified would provide. We also can conclude that mother neither identified herself as a potential witness nor provided a description of her expected testimony in her response to that interrogatory.

witness and provide the subject matter of and facts underlying each identified witness' anticipated testimony. Mother neither included herself among the names of potential witnesses nor provided a description of her anticipated testimony in her response to the interrogatory.

After the close of discovery and consistent with the pretrial order, mother filed her proposed exhibit and witness list on November 16, 2018. Mother was listed as a witness on her witness list. Father objected to mother's inclusion on the witness list on November 20, 2018, specifically objecting because neither mother nor her anticipated testimony had been identified in response to the pertinent interrogatory.

The circuit court addressed father's objection at the outset of trial. Father acknowledged no surprise in mother appearing on the witness list, but stated that he objected because of mother's failure to provide him with any indication as to the substance of her anticipated testimony as requested in the interrogatory. Mother had not been deposed, and father noted that most of mother's discovery responses involved documentation and information from third parties, not from mother. Mother argued that everyone knew or should have known that she would testify and that the subjects on which she would testify could be ascertained from the pleadings she had filed. The circuit court again sustained father's objection, stating to mother's counsel that "you didn't identify your witness, so she can't testify." Mother then moved for a continuance; the circuit court denied the motion and the case proceeded.

Mother called her mother, Rakia Ejjazouli (Ejjazouli) as her first witness. Ejjazouli testified to the condition of the child upon her return to mother's house after time with father; she stated that the child had messy hair and a stuffy nose and that clothes would not be returned. With respect to the child talking to father over the phone during mother's custody time, Ejjazouli relayed that the child did not like to speak to him when engaged in other activities, but that she and mother encouraged the child to do so.

- 4 -

During direct examination, Ejjazouli was asked, "[D]o you recall the day of January 13th, 2015?" She responded, "It's the day when he came to kidnap her." When counsel then asked "what happened," father objected on relevance grounds, stating that the query related to events predating the hearing that resulted in the existing custody order. Father also objected in light of mother's failure to identify this line of inquiry in her discovery response pertaining to Ejjazouli; mother acknowledged that failure. Ultimately, the circuit court sustained the objection. Mother presented no proffer as to what Ejjazouli's testimony on the issue would have been.

Mother's brother, his wife, and mother's neighbor also testified. Their testimony described generally the relationship between mother and child and the activities and living arrangements the child enjoyed while at mother's residence. A colleague of mother's, another teacher from King Abdullah Academy, was called to testify to the academics, leadership, and facilities available at the school; on cross-examination, she acknowledged that she was not very familiar with the features of its pre-school program.

After calling her witnesses, mother again raised the issue of her being allowed to testify in her case-in-chief, asserting that the parties would "be testifying to similar issues." The circuit court reiterated its previous ruling, and mother renewed her request for a continuance so that she later could testify to "all the details and facts that she might have otherwise desired to do so." Mother did not suggest what that testimony might be or otherwise proffer the testimony she wished to give.

Father's testimony revealed that he worked as a driver for a limousine service and Uber and was able to set his own hours. He relayed that his mother and sister lived with him and that the child had her own room and bed. He described his daily routine with the child, including hygiene practices. He reported that mother had changed their child's health insurance without informing him, that she consistently sent him nasty e-mails and made false accusations against him, and that mother's relocation had increased his commute for exchanges from fifteen minutes to

one-and-a-half hours. He complained that mother prevented him from speaking to his child over the phone while she was in mother's custody.

Father reported an incident occurring in the summer of 2016. Mother's birthday fell on father's custodial day. Per the 2015 order, mother was entitled to time with the child that day, so when the child had not been dropped off at the expected time, mother texted father asking where the child was. When he realized it was mother's birthday, father apologized to mother, saying that he had forgotten, and that he was on his way. When he arrived at mother's residence about an hour after the ordered time, the police were waiting for him and he was charged with failure to obey a court's order, a charge that ultimately was *nolle prosequied*.

Father admitted to calling CPS twice and the police once. He said that he called CPS in 2015 and 2016; he specifically testified that he called in 2016 after seeing an unusual bruise on the child's hand and not getting a response from mother when he called her to ask her about it. No findings of abuse were made. He explained that he called the police in August 2017 after he had received no response from mother to several messages over the course of the day.

Meghan Wilcox, the director of administration at Crème de la Crème, relayed how father had enrolled his child at the center to attend on his custodial days. She testified that father and the child appeared to have a "really good relationship" and that the child "seems like a healthy, normal child" and always came to school looking "nice and presentable." Wilcox also described the facilities and curriculum of the school.

Wilcox further testified to a Friday evening when mother and her brother visited the school. Wilcox said they arrived unannounced with the child around 5:30 p.m. and then took an unaccompanied tour of the facility. Roughly thirty minutes later, another employee summoned Wilcox back to the office, where mother requested to see her child's files. Wilcox attempted to explain to mother that the file was unavailable at the moment and that it usually took five to seven

business days to collect and provide the information. Mother then became "upset"; "she was visibly frustrated, started demanding that essentially I do what she's asking, refusing to listen, kept interrupting me and just demanding saying she was not going to leave without seeing what was in her child's file[.]" Wilcox described mother's tone as "rude" and her voice as "elevated," but not "yelling." She indicated that mother's brother also was "rude" and "belligerent." The child was present during the episode, and they left around 6:30 p.m. after the intervention of the executive director. Wilcox also testified that on a later occasion mother called "demanding to know" whether the child was present in the school that day. When Wilcox explained that school policy prohibited her from disclosing such information over the phone, mother indicated that if the information were not provided, she would contact the police.

Valerie Wenhold from CPS testified about her investigation of a family abuse allegation involving mother in 2015. The incident occurred in February, prior to the parties' last custody hearing, but CPS did not issue a finding until June, after the March 2015 custody hearing. Wenhold stated that she interviewed father and his sister, Ilham Al-Jawahiry, at father's residence, but that mother agreed to meet her at social services to discuss the matter. Wenhold testified that mother reported to her that "she had grabbed a hold of [Ilham Al-Jawahiry] in an attempt to gain [the child]" when mother encountered them at the mall. Wenhold further testified that "both women reported having their own injuries as a result of the physical confrontation" and that mother indicated that "she felt [the child] had been bruised during the incident." CPS made "a finding that [mother had] put her daughter at risk of physical harm by causing the incident." Wenhold explained: "[T]he finding was made because it was Mom's testimony that she had physically held onto the sister while holding the baby."

Although mother was not permitted to testify in her case-in-chief, the circuit court permitted her to testify in her rebuttal case. Mother acknowledged that she had moved when she had changed

her employment. She stated that the change required her to get new health insurance for the child and compelled her to choose a new doctor for her. She denied failing to inform father of the change in insurance. She testified that the new home was very close to the school mother wanted her child to attend, the new doctor's office, and the dance studio where the child had started taking ballet lessons.

Mother expressed frustration regarding what she viewed as father's lack of communication regarding health issues, his disregard of her schedule in arranging for appointments, and a disagreement over the child's use of a pacifier. She presented concerns regarding the condition of the child upon return to her care. Mother stated that she believed she made good decisions for the child and relayed that she engaged her in many enrichment activities, including ballet and swimming lessons, visits to the park and library, exposure to French and Arabic, and watching performing arts. She described her daily routine with the child and what actions she was taking to prepare her for kindergarten. She testified to efforts she was making to communicate better with father and to encourage the child's relationship with him.

Mother was questioned regarding her calling the police when father failed to deliver the child to her on time on her birthday, as required by the 2015 order. She said that she had made a mistake, but always has a fear that father will take the child and she will not see her again. When mother stated such fear had arisen "since [father] snatched [the child] from home[,]" father objected and the circuit court sustained the objection. The circuit court further inquired, "[W]hen [father] showed up with his daughter after texting . . . , why didn't you tell the police I overreacted, he didn't try to internationally abduct my child? [Instead], you proceeded to have him prosecuted." It continued by stating,

> you wanted to jam him up and get him locked in a jail when he texted you saying I'm sorry, I forgot about the birthday clause, I'm coming right now, and you had the police waiting for him. So don't say I thought he was taking the kid to Iraq, that is nonsense and I

don't believe you. If you want to answer why you really did it, that's fine, otherwise I'm just viewing you as a witness who is not being credible.

After further discussion, mother's counsel asked her why she did not "call the police off" once she received father's text message. She replied, "Because I felt it's very important for [my child] to be with her mother on her birthday and Your Honor, [father] tried to put me in jail several times, several times." When asked by the circuit court whether she thought "losing [that extra custodial time] was so important to [the child's] wellbeing that it was worth it to have her father arrested in front of her[,]" mother asserted, "I did not press charges, I did not tell the police to press charges." Upon further denials by mother that she played a role in the arrest and short-lived prosecution of father, the circuit court offered to continue the case so that father could subpoena the arresting officer to testify. Father suggested that the prosecutor who *nolle prosequied* the charge might be called as a witness as well, and mother's counsel requested a recess to discuss the matter with mother. When the case resumed, mother's counsel withdrew his questions and asked to strike any statements made by mother "regarding whether she asked the police to press charges and whether she asked the prosecutor to prosecute or not."

With respect to the incident at Crème de la Crème, mother acknowledged that she had gone to the school with the child and requested records, but denied having raised her voice. She also denied having had any physical contact with her sister-in-law during the episode at the mall. Mother claimed that she was not given fair treatment by Wenhold, asserting that Wenhold "did not let me talk. And I felt it was not fair . . . . She did not come to visit my house and I believe that's what they do." Mother's brother also testified on rebuttal to corroborate mother's accounts of the events.

During the course of the trial, both parties introduced copious e-mails, text messages, and photographs. The e-mails and texts disclosed the tenor of the parties' communications and the

photographs contained depictions of the parties' residences, the child engaged in various activities during each parent's custodial time, and the physical condition of the child at the captured moments. Also admitted into evidence was Wenhold's letter to father informing him of CPS's determination that the allegation of family abuse arising from the mall incident was "founded."

The circuit court ruled from the bench. It first noted that it had "fully considered the testimony of the witnesses and the arguments of [c]ounsel [and o]f course, . . . observed witnesses and their demeanors and made determinations as to their credibility." It then addressed whether there had been a material change in circumstances, finding that "the parents have shown an inability to co-parent [their child] effectively since the [c]ourt's 2015 order under the current arrangement" and that mother's "move . . . increased the commute between the parties' residences each way by over an hour and thus increases the time that [the child] spends in the car mid-week, which previously was only about fifteen minutes during the exchanges." The circuit court concluded that these "material changes in circumstances warrant changes to the custody arrangement for the best interests of [the child]."

The circuit court detailed its consideration of the statutory factors in determining the best interests of the child. It found no physical or mental problems with the child or the parties and stated that "[t]he evidence suggests that both parents love their child and are involved in the child's life." The circuit court further reported that while "[b]oth [parties] claim that the other respective parent abuses the child[,]" each parent's respective "witnesses depict a picture of a loving, caring, and attentive" father and mother.

The circuit court's discussion of the remaining factors focused on the negative aspects of the parties' relationship with each other. It determined that "[t]he level of strife between [the] parents makes it difficult for them to co-parent" and reiterated that "[t]he inability of [the] parents to effectively co-parent . . . constitutes a change in circumstances that warrants an immediate change in

the custody and visitation arrangement." In reaching its conclusion, the circuit court highlighted several circumstances as examples of the parties' animosity and inability to communicate: the CPS finding regarding the incident at the mall; both parents calling the authorities and accusing the other of abusing the child, with specific reference to mother's calling the police when father was late in delivering child after failing to "realiz[e] that birthdays were an exception to the weekly custody arrangement set forth in the 2015 order[;]" mother's failure to inform father that she had obtained a driver's license despite the provision in the 2015 order directing her to do so; mother's unilateral change of the child's doctor; and allegations by both parents that the other is depriving him or her phone time when the other has custody. It stated that "[d]ue to the level of conflict between the parties, it is difficult for the [c]ourt to ascertain the ability of the parents to assess and meet the child's needs[.]" It further found that "hostility is primarily directed towards [father] by [mother]" and that "[t]he evidence is clear . . . that [mother's] anger and hostility towards [father] sometimes causes her to act against the best interests of [the child]." The circuit court also referenced mother's relocation and noted its "practical effect of changing the commute between the residences from fifteen minutes to one hour thirty minutes" thereby adding a burden to father who is responsible for pick-ups and drop-offs under the 2015 order. In making its findings, the circuit court expressly noted that it found Wilcox and Wenhold credible.

Based on its findings, the circuit court awarded the parties joint legal custody, with father "having tie breaking authority if the parties cannot agree." It further ruled that mother "will have custody of [the child] from Friday at 6:30 p.m. until Sunday at 6:30 p.m. [and father] will have custody of [the child] from Sunday at 6:30 p.m. until Friday at 6:30 p.m." It directed that the child would attend only the preschool father had chosen. With respect to attorney's fees, the circuit court stated that father's "attorney's fees were $8,000 at the time of trial, [while mother's] attorney's fees

were $12,437.52." "Having considered all of the equities of the case," the circuit court awarded father $3,500 in attorney's fees.

A hearing was held on February 1, 2019, for entry of the final order. The circuit court first addressed a few "clarifying motions" brought by mother; it denied each of them, including her request that she have authority to pick up the child from school in the event of an emergency or for lunch. It then entered its order memorializing its rulings. Mother objected on numerous grounds and filed a motion to reconsider. The circuit court summarily denied the motion by order dated February 25, 2019, and this appeal followed.

Mother asserts fifteen assignments of error. The first four are all different ways to cast the same argument: the circuit court committed error when it did not permit mother to testify during her case-in-chief. Eight of the remaining eleven assignments of error ostensibly challenge the circuit court's consideration and balancing of the statutory factors found in Code § 20-124.3 or its decision to award father tie-breaking authority over decisions regarding the child. However, underlying the challenges regarding the consideration and balancing of the statutory factors raised and the award of such authority to father is the assertion that the circuit court could not have adequately considered the factors or the award because it was denied mother's testimony in her case-in-chief regarding these issues. At oral argument in this Court, mother conceded that these eight assignments of error rise and fall with her arguments that it was error to prohibit her from testifying in her case-in-chief: if the circuit court did not err in excluding that testimony, it did not err in its consideration or balancing of the statutory factors or in awarding father tie-breaking authority over decisions regarding the child.[2]

---

[2] The record reveals that the circuit court appropriately considered and balanced the statutory factors based on the evidence presented. Each part of the circuit court's custody ruling reflected a reasonable balancing of the factors, and the circuit court appropriately articulated the basis for its rulings. Absent the potential issue mother raises regarding the lack of her testimony

The three remaining assignments of error are the only assignments of error that are not related to the circuit court's decision to prohibit mother from testifying in her case-in-chief. In one, she challenges the circuit court's decision to prohibit her from offering evidence of an alleged incident of abuse committed by father prior to the March 2015 custody hearing. In another, she challenges the decision of the circuit court to admit evidence of an alleged incident of abuse that was committed by her prior to the March 2015 custody hearing. Finally, she asserts the circuit court erred in awarding father $3,500 in attorney's fees.

ANALYSIS

I. Standard of Review

All of mother's assignments of error challenging rulings of the circuit court related to the admission or exclusion of testimony are reviewed "under an abuse of discretion standard and, on appeal, [we] will not disturb a circuit court's decision to admit [or exclude] evidence absent a finding of abuse of that discretion." Lambert v. Commonwealth, 70 Va. App. 740, 749 (2019) (quoting Herndon v. Commonwealth, 280 Va. 138, 143 (2010)). Similarly, we review the circuit court's award of attorney's fees to father under the deferential abuse of discretion standard. See Richardson v. Richardson, 30 Va. App. 341, 351 (1999).

"An abuse of discretion occurs only when reasonable jurists could not differ as to the proper decision." Reston Hosp. Ctr., LLC v. Remley, 63 Va. App. 755, 764 (2014) (internal quotation marks omitted) (quoting Brandau v. Brandau, 52 Va. App. 632, 641 (2008)). The abuse of discretion standard "necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable." Hamad v. Hamad, 61 Va. App. 593, 607 (2013). Our use of this deferential

on these issues in her case-in-chief, nothing about the circuit court's consideration of the statutory factors or its disposition related to them could be considered error.

- 13 -

standard of review "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie."  Id.

## II.  Exclusion of mother's testimony in her case-in-chief

As noted above, "we review a trial court's decision to admit or exclude testimony using an abuse of discretion standard."  Harman v. Honeywell Int'l, Inc., 288 Va. 84, 97 (2014); see also Jefferson v. Commonwealth, __ Va. __, __ (Oct. 24, 2019).[3]  In this case, however, we do not reach the question of whether the circuit court abused its discretion in denying mother the opportunity to testify in her case-in-chief because the record is insufficient to allow us to determine whether this ruling, if it were erroneous, would constitute reversible error.

"Virginia law requires the proponent of excluded testimony to proffer the specific substance of the testimony to allow us to determine if its exclusion was harmless error or not." Virginia Bd. of Med. v. Zackrison, 67 Va. App. 461, 485 (2017).[4]  Mother conceded at oral argument in this Court that she did not proffer to the circuit court the testimony she would have given if she had been allowed to testify in her case-in-chief.  This is fatal to her argument on appeal.  See Molina v. Commonwealth, 47 Va. App. 338, 367-68 (2006).

---

[3] In this case, it does not matter whether the issue is framed simply as the circuit court's exclusion of testimony or as one regarding the exclusion of the testimony as a discovery sanction.  The standard of review is the same.  See Flora v. Shulmister, 262 Va. 215, 220 (2001) (recognizing that the applicable standard of review regarding imposition of a discovery sanction is the abuse of discretion standard).

[4] We are required by statute to conduct harmless error review in all cases.  See Code § 8.01-678; Commonwealth v. White, 293 Va. 411, 419 (2017) ("The harmless-error concept is no mere prudential, judge-made doctrine of appellate review"; it "is a legislative mandate[.]").  We note that the circuit court, in very plain language, made a finding from the testimony that mother did give that she was not worthy of belief.  Accordingly, it is unlikely that any additional testimony from mother, whether in her case-in-chief or not, would have changed the outcome.  See Zackrison, 67 Va. App. at 484 ("A non-constitutional error is harmless if when all is said and done, we can conclude that the error did not influence the [factfinder], or had but slight effect.") (alteration in original) (internal quotation marks and citations omitted).

Although the requirement that a party proffer the excluded testimony can seem harsh, it is necessary to allow an appellate court to perform its function properly. As we observed in Massey v. Commonwealth, 67 Va. App. 108, 132 (2016),

> when testimony is rejected before it is delivered, an appellate court has no basis for adjudication unless the record reflects a proper proffer. For a proffer to be sufficient, it must allow us to examine both the admissibility of the proposed testimony, and whether, even if admissible, its exclusion prejudiced the proffering party.

(Internal quotation marks and citations omitted).

Although required in all cases, the need for a proffer in this case is particularly acute because mother *did* testify at length, over the course of two days, during the proceedings, albeit in her rebuttal case. We acknowledge that, in her rebuttal case, her testimony was limited to topics raised in father's presentation of evidence; however, absent a proffer, we have no basis to conclude that the testimony she would have given in her case-in-chief would have differed in any material way from the testimony she did give.

As a result of the foregoing, we are not in a position to conclude that the circuit court committed reversible error in excluding mother's testimony in her case-in-chief. Thus, none of the assignments of error related to the exclusion of mother's testimony in her case-in-chief, including the assignments asserting a failure to properly consider or balance the statutory factors or that it was error to award father tie-breaking authority over decisions regarding the child, provide a basis for reversing the circuit court. Accordingly, we affirm the judgment of the circuit court on these issues.

III.  Evidentiary rulings regarding events that predate the existing custody order

Mother's sixth and seventh assignments of error pertain to the circuit court's treatment of evidence related to events involving incidents that occurred prior to the March 2015 custody hearing.  Reading the assignments of error together, mother asserts the circuit court erred in excluding evidence of a January 2015 incident involving father's alleged attempt to impermissibly take the child, while admitting evidence of a February 2015 incident in which she was alleged to have put the child at risk of physical harm.  Because of the facial similarities between the two incidents as regards timing, mother argues that the circuit court issued "conflicting ruling[s,]" and therefore, committed reversible error.

The essence of the circuit court's rulings on the admission of evidence related to the two incidents was that the alleged January 2015 incident involving father was irrelevant and the February 2015 incident involving mother that was reported to CPS was relevant.  As noted above, we review a circuit court's decision regarding the admission or exclusion of evidence, including on the grounds of relevance, for an abuse of discretion.  Creamer v. Commonwealth, 64 Va. App. 185, 194 (2015).

To contextualize the circuit court's seemingly disparate relevancy rulings regarding the two incidents in question, it is important to recall the nature of the proceeding.  The matters before the circuit court were the parties' cross-petitions for modification of an *existing* custody order.  Accordingly, the circuit court was charged with determining whether "(1) there ha[d] been a material change of circumstances *since the entry of the previous visitation* order and (2) that a change in [custody or] visitation would be in the best interests of the child[]" in light of such material change.  Rhodes v. Lang, 66 Va. App. 702, 711 (2016) (emphasis added).

Although a circuit court may elect to hear evidence of events that occurred before the existing custody order to provide a fuller understanding of events that occurred after the entry of

- 16 -

the order, it is not required to allow the parties to rehash events that were either argued as part of the prior custody hearing or could have been raised at that hearing. Because all aspects of the alleged January 2015 incident involving father occurred prior to the custody hearing that gave rise to the existing custody order, that incident cannot represent a material change in circumstances. Accordingly, we cannot say that the circuit court abused its discretion in finding the incident irrelevant and prohibiting mother from offering evidence regarding the incident.

Unlike the alleged January 2015 incident involving father, not all aspects of the February 2015 incident involving mother had been completed when the March 2015 custody hearing occurred. Specifically, the incident was being investigated by CPS and no finding had been issued. Thus, although mother's actions giving rise to the incident and the subsequent report to CPS had occurred, CPS's conclusion was not available.

At oral argument in this Court, mother conceded that an adverse finding by CPS against a parent is a valuable piece of evidence in a child custody dispute. This is especially true in cases, like this one, where there have been multiple cross-allegations of misconduct, abuse, and neglect. The fact that CPS, a neutral, third party, has investigated and determined that a parent's allegations are founded certainly may be considered by a circuit court in making a custody decision. Here, CPS ultimately determined that the allegation against mother related to the February 2015 incident was founded and that mother had placed the child "at risk of physical harm" in the incident. Because this finding had not been made when the March 2015 custody hearing occurred, it was a "new" fact during the instant proceeding below.

We find this to be a distinction with a difference. Because the CPS finding represented new information, it was reasonable for the circuit court to find it relevant in determining whether there had been a material change in circumstance affecting the best interests of the child. Accordingly,

we cannot say that the circuit court abused its discretion in admitting evidence related to the February 2015 incident involving mother.

IV. Award of attorney's fees to father

Mother contends the circuit court erred in awarding father $3,500 in attorney's fees because "no evidence [was] presented of [mother's] ability to pay compared to [father's]" and because there was not "any consideration [of] the reasonableness of each party during the proceedings . . . ."

As noted above, "an award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion." Richardson, 30 Va. App. at 351 (quoting Graves v. Graves, 4 Va. App. 326, 333 (1987)). Trial courts have broad discretion in awarding reasonable attorney's fees based on "the circumstances of the parties" and "the equities of the entire case[.]" Allen v. Allen, 66 Va. App. 586, 601-02 (2016) (quoting Mayer v. Corso-Mayer, 62 Va. App. 713, 734 (2014)).

The evidence in the record is sufficient to support the circuit court's award for attorney's fees to father. Based on mother's own filings below, she is a full-time teacher at "an accredited state-of-the-art private school" and lives "in a 3,000 square feet townhome with three bedrooms, three and a half bathrooms, a finished basement, and a backyard." As of the time of the final decree of divorce, she was making in excess of $56,000 a year and was employed in the same position by the same employer at the time of the proceeding that is subject to this appeal. Accordingly, there was sufficient evidence to allow the circuit court to conclude that her circumstances allowed her to pay the fee award.

Furthermore, the $3,500 fee award is relatively meager when the litigation is viewed as a whole. The parties engaged in discovery, had disputes about that discovery, and conducted a contentious, multi-day trial on the issue of custody. From the evidence in the record, the circuit

court reasonably could conclude that some of mother's actions in the proceedings were the cause of some of the strife and unnecessarily lengthened the proceedings.

Given the foregoing, we cannot say that no reasonable judge viewing this record would have awarded father $3,500 in attorney's fees. Accordingly, we cannot say that an abuse of discretion occurred, <u>Reston Hosp. Ctr., LLC</u>, 63 Va. App. at 764, and therefore, we affirm the judgment of the circuit court regarding attorney's fees.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

<u>Affirmed.</u>[5]

---

[5] Father requested that we make an award of attorney's fees related to the fees he has incurred in defending against the appeal. We award appellate fees only in the unusual case where the arguments on appeal are "not fairly debatable under any reasonable construction of the record or the governing legal principles. We have no reluctance imposing fees in such circumstances." <u>Brandau</u>, 52 Va. App. at 642. We conclude that the unusual circumstance of a mother being prohibited from testifying in her case-in-chief in a child custody matter is not such a case and that mother reasonably sought appellate review of that decision. Accordingly, we deny father's request for attorney's fees on appeal.