UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Chaney and Raphael
Argued by videoconference


ALHAJ BABAH THULLAH

MEMORANDUM OPINION* BY
v.      Record No. 0088-22-4                 JUDGE VERNIDA R. CHANEY
FEBRUARY 21, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Tracy C. Hudson, Judge

William A. Boge for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Prince William County Circuit Court convicted Alhaj Babah

Thullah of two counts of rape pursuant to Code § 18.2-61. Thullah contends the trial court erred in

denying his motion to strike since the victim's testimony was not credible as a matter of law and, for

count two, argues the evidence was insufficient to prove the use of force, threat, or intimidation. For

the following reasons, this Court affirms the trial court's judgment.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Thullah and H.B. were friends and classmates in their home country, Sierra Leone, but were never romantically involved. Years later, in 2020, they reconnected on social media and discovered both were living in Virginia. On Saturday, August 8, 2020, H.B. invited Thullah to visit her at her apartment in Woodbridge.

Because Thullah did not know the Woodbridge area, H.B. agreed to show him around. H.B. told Thullah she had a boyfriend, whom she spoke with on the phone in Thullah's presence during his visit. After spending the day together, H.B. was comfortable letting Thullah spend the night rather than having to drive him back that night to his military base at Quantico. Since in their native country homes were small and members of the opposite sex often had to share a bed, H.B. and Thullah were comfortable sleeping in the same bed. The following morning H.B. drove Thullah back to his barracks.

A couple weeks later, on Friday, August 21, H.B. and Thullah arranged another visit. Thullah got a ride to H.B.'s apartment and had planned to have H.B. drive him back after going out for a few hours. However, because H.B.'s car was being repaired and she did not have transportation, they did not go out, and Thullah stayed overnight. Again, the two shared H.B.'s bed with no sexual activity.

The next day, Thullah worked out, H.B. prepared food to host friends later, and the pair walked around her neighborhood. H.B.'s friends, including C.K., arrived in the afternoon and stayed until around 11:00 p.m. Given the late hour, H.B. told Thullah she would drive him back to Quantico the next day when her car was available.

When H.B. and Thullah went to bed, Thullah was wearing pants and a shirt, and H.B. wore pajama pants and a shirt. H.B. fell asleep but woke up when she felt the bed covers being pulled

away. Upon realizing that Thullah had removed the covers, H.B. asked, "What are you doing?" Thullah replied, "Oh, I'm sorry. I love you." H.B. told him to stop and reminded him she had a boyfriend, but Thullah pulled down her pants. When H.B. tried to push Thullah away, he grabbed her wrists, squeezed her hands so forcefully that he hurt her, and pinned her hands above her head. When H.B. continued to plead with him to stop, he pulled up her shirt and forcefully undressed her. Thullah told H.B. he "w[ould] not stop because he love[d] [her] and he d[id]n't want to lose [her] to anyone." H.B. began crying and continued to protest, but Thullah wedged her legs open with his knee and had sexual intercourse with her without her consent. When he finished, Thullah went into the bathroom. H.B. remained on the bed, crying.

When Thullah returned to the bedroom, he grabbed H.B.'s hands again, pushed her back on the bed, and had sexual intercourse with her a second time. H.B. testified that she did not physically resist Thullah the second time because she feared him, noting he had "squeezed" her hands forcefully during the first rape. Afterward, H.B. showered, dressed, and before leaving for work, she told Thullah to leave her home. Thullah did not respond.

On her way to work, H.B. called her friend C.K. and told her "Thullah wanted to rape her," but she did not elaborate. Since H.B. was at work, she told C.K. she would call her later. When H.B. came home early from work because she felt ill, Thullah was standing outside her apartment. H.B. agreed to drive him back to his barracks. H.B. testified that during the drive, Thullah apologized for what he did. He admitted it was wrong but said he did it because he loved her and he did not want to lose her to anybody. H.B. left Thullah at his barracks. Later that day, he "messaged" her, admitting "what [he] did was unforgivable" and explaining "[h]e was carried away by [H.B.'s] beauty." In response, H.B. said she would call the police.

Before notifying the police, H.B. told C.K. that Thullah had "raped her . . . twice." C.K. testified that when H.B. told her, H.B. was crying so hard she could hardly speak. In H.B.'s

presence, C.K. called Thullah and confronted him about the rapes. Thullah apologized and stated that he was praying H.B. would not get pregnant.

Two days later, on August 25, H.B. reported the rapes to the Prince William County Police Department and underwent a forensic sexual assault examination. H.B. told the Sexual Assault Nurse Examiner (SANE) nurse that Thullah had raped her twice on the same night.[1] H.B. stated that she had told Thullah "no," but when she tried to push him away, he pushed her, shook her, and "grabbed both her hands."

Thullah testified at trial on his own behalf. He admitted that he had sexual intercourse with H.B. twice in the early morning of August 23, but Thullah claimed it was consensual. Although he admitted H.B. initially resisted having sex with him, Thullah claimed that he used "sweet words" on her until she "nodded." Thullah claimed that H.B.'s "nod" expressed consent. He maintained that H.B. became angry with him only because he convinced her to have sex without a condom and that his later apologies referred to the lack of birth control, not rape. He disputed H.B.'s testimony that members of the opposite sex often shared a bed "in [their] culture" without sexual overtones. Thullah stated that he believed H.B. was sexually attracted to him. He denied raping H.B.

On cross-examination, Thullah admitted that he lied to Detective Conway when he told him in August 2020 that H.B. had asked for sex. He also admitted that he never told the detective that H.B. consented to sex by "nodding" at him. Thullah conceded that he deleted his text conversations with H.B. and that he never told the detective that H.B. was upset only because he did not use birth control.

---

[1] Portions of the record in this case were sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignment of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

Thullah moved to strike both counts of rape. He argued that the evidence failed to show the sexual act occurred against the victim's will by force, threat, or intimidation and that the victim was inherently incredible. The trial court denied Thullah's motions to strike.

ANALYSIS

A. Standard of Review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

B. Evidence of Inherent Incredibility

Thullah asserts that H.B.'s uncorroborated testimony was inherently incredible because it was "contrary to human experience." He notes that H.B. gave inconsistent accounts on various topics, including H.B.'s description of his clothing and whether she slept between the two assaults. He further argues that H.B.'s account of him taking her shirt and pants off, and taking his pants off while simultaneously holding her hands down, defies logic. Thullah stresses that H.B. dressed, went to work, and left him in her home after the rapes, rather than reporting the assaults

- 5 -

immediately. He contends that H.B.'s allegations were also impeached by her willingness to drive him back to the military base alone and by waiting two days before reporting the rapes to the police. Finally, Thullah asserts that H.B.'s testimony was uncorroborated because of the lack of any noticeable injuries documented in the SANE examination.

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "Where credibility issues are resolved by the jury in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010). Any "[p]otential inconsistencies in testimony are resolved by the fact finder." *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011). Such conflicts are not revisited on appeal "unless 'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion.'" *Id.* (alteration in original) (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006)).

"[C]ontradictory statements by a witness go not to competency but to the weight and sufficiency of the testimony. If the trier of the facts sees fit to base the verdict upon that [witness's] testimony there can be no relief in the appellate court." *Smith*, 56 Va. App. at 718-19 (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). The fact-finder "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc). "[T]his [C]ourt will not seek to pass upon the credibility of the witnesses where their [testimony] is not inherently incredible." *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018) (first and second alterations in original) (quoting *Rogers v. Commonwealth*, 183 Va. 190, 201-02 (1944)).

Here, a rational fact-finder could have credited H.B.'s testimony notwithstanding the asserted deficiencies. "[A] conviction for . . . [a] sexual offense[] may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). Although Thullah asserts H.B.'s testimony was not credible because she waited two days to disclose the rapes, C.K. testified that H.B. called her on the morning of the rapes and told her Thullah "wanted to rape her." When H.B. reached work, she could not finish her shift, and that afternoon, she texted Thullah that she was going to call the police. Within two days, a hysterically crying H.B. told C.K. that Thullah had raped her twice, and when C.K. confronted Thullah, he did not deny the rapes. Instead, he responded that he was praying H.B. was not pregnant.

Although H.B.'s initial account given to Detective Conway varied in some respects from her testimony, the inconsistencies were not so significant as to render her testimony inherently incredible. Detective Conway emphasized that his notes of H.B.'s interview summarized her statements and omitted some details. As our Supreme Court has held, a witness's delay in reporting an offense or providing inconsistent statements "does not necessarily render the testimony unworthy of belief. [Such] circumstance[s] [are] appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006). Whether H.B.'s decision to drive Thullah back to his base after the rapes demonstrates that H.B. did not exhibit any fear of her rapist as would be expected under the circumstances is also a matter for the jury's determination. *Id.*

Similarly, any skepticism about the physical possibility of Thullah taking off both of their garments while holding H.B.'s hands down does not render her testimony so incredible that a fact-finder would doubt the occurrence of the rapes. "Judging the credibility of the witnesses and weighing the evidence as a whole, the factfinders are free to choose among all reasonable

inferences, although some inferences may be more probable than others." *Parker v. Davis*, 221 Va. 299, 305 (1980) (citation omitted).

Additionally, Thullah admitted during cross-examination he lied to the police when he stated H.B. asked him to have sex with her. He also admitted he never told Detective Conway that H.B. consented to sex by "nodding" at him or that his later apologies related solely to his lack of birth control. Based on Thullah's admission that he deleted his text conversations with H.B., the fact-finder could also conclude that he deleted the text messages to conceal his guilt. Viewed in the light most favorable to the Commonwealth, the record does not demonstrate that H.B.'s testimony was inherently incredible. *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) ("[T]his Court cannot say a witness' testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011))). Accordingly, the trial court did not err by denying Thullah's motion to strike the evidence.

## C. Evidence of Force, Threat, or Intimidation

For count two, Thullah argues that the evidence was insufficient to prove his guilt because it did not establish that he engaged in sexual intercourse with H.B. through force, threat, or intimidation. He also submits that the trial court misapplied *Martin v. Commonwealth*, 272 Va. 31 (2006), when it denied his motion to strike. He relies on H.B.'s admission that she did not resist him when he raped her the second time. Thullah argues that intimidation occurs only when the victim is placed in fear of bodily harm based on "some conduct or statement of the accused." Thullah further argues that the Commonwealth presented no such evidence. He also contends that the trial court erred when it concluded that a victim's lack of consent is sufficient to prove "force."

"The Code [of Virginia] does not define force in the context of sexual offenses." *Nelson v. Commonwealth*, 73 Va. App. 617, 624 (2021). "Applying longstanding common law principles,

Virginia's appellate courts have repeatedly held that in the context of sexual offenses . . . 'force' [is defined to] include[] both actual and constructive force." *Id.* (second and third alterations in original) (quoting *Martin v. Commonwealth*, 272 Va. 31, 34 (2006)). "Constructive force is established . . . if the act was undertaken 'without the victim's consent' and 'against [the] victim's will.'" *Id.* at 625 (second alteration in original) (quoting *Martin*, 272 Va. at 35); *see also Gonzales v. Commonwealth*, 45 Va. App. 375, 383 (2005) (en banc) (acknowledging "clear Virginia precedent," set out "as long ago as 1886," that lack of consent may prove force for purposes of sex crimes). "[P]roof of a lack of consent 'provides all the force [that] the law demands as an element of the crime.'" *Nelson*, 73 Va. App. at 625-26 (second alteration in original) (quoting *Martin*, 272 Va. at 35). "[W]herever there is a carnal connection[ ] and no consent in fact, . . . the wrongful act itself [provides] all the force which the law demands as an element of the crime." *Id.* at 627 (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 381 (2002)). "The prosecution does not need to prove 'positive resistance' by the victim if the crime was committed 'without [his or] her consent.'" *Id.* at 625 (quoting *Jones v. Commonwealth*, 219 Va. 983, 986 (1979)).[2] Thus, we find no merit in Thullah's argument that the trial court misconstrued *Martin* when it concluded that "a sexual act undertaken against the victim's will, and without the victim's consent, is an act undertaken with force."

Based on the record, the evidence supported a rational finding that Thullah used either actual force or constructive force to engage in sexual intercourse with H.B. the second time. The evidence was sufficient to prove actual force based on H.B.'s testimony and statements that Thullah grabbed her by the wrists, pulled her from the floor, and pushed her onto the bed. The evidence was

---

[2] In fact, the jury was so instructed. The trial court instructed the jury that the Commonwealth was not required to prove "that the victim cried out or physically resisted . . . Thullah, in order to convict him of [rape]," but H.B.'s lack of resistance could be considered in determining whether she consented to sexual intercourse.

also sufficient to prove that Thullah engaged in sexual intercourse with H.B. through constructive force because she did not consent. H.B. repeatedly protested and physically resisted during the first rape and was on the floor still crying when Thullah pushed her onto the bed and had sex with her again. Based on the circumstances, the rational trier of fact could reasonably conclude that she did not consent to the second sexual encounter with Thullah. Accordingly, the evidence was sufficient to prove that Thullah engaged in sex with H.B. either through actual force or constructive force.

Considering all of this evidence, and the reasonable inferences that can be drawn from it, H.B.'s testimony was not inherently incredible, and the evidence was sufficient to prove beyond a reasonable doubt that Thullah accomplished the second rape either through actual force, constructive force, or intimidation. Therefore, the trial court did not err by denying Thullah's motion to strike the second rape charge.

CONCLUSION

The evidence is sufficient for a rational fact-finder to find proof of the essential elements of two counts of rape. Accordingly, this Court affirms the convictions.

*Affirmed.*